UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN MULTI-CINEMA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MANTECA LIFESTYLE CENTER, LLC,<br><br>Defendants. | No. 2:16-cv-01066-TLN-KJN<br><br>**AMENDED FINAL PRETRIAL ORDER**<br><br>Trial Date: July 26, 2022<br>TIME: 9:00 a.m. |

This Court held a Final Pretrial Conference on April 7, 2022. Plaintiff American Multi-Cinema, Inc. ("Plaintiff") was represented by Robert H. Platt and Christian Baker. Defendant Manteca Lifestyle Center, LLC ("Defendant") was represented by Daniel C. Fleming, Deborah Cochran, and Linda Wong. After the hearing, the Court makes the following findings and orders:

**I.      JURISDICTION / VENUE**

This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is a complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has personal jurisdiction over Defendant because Defendant was and is doing business in California.

Venue is appropriate in the Eastern District of California, Sacramento Division, because the events relevant to the Complaint substantially occurred in the County of San Joaquin,

California.  The lease at issue was executed within the geographic territory of the Sacramento Division of this Court (Sacramento and Sonoma Counties) and was to be performed in the City of Manteca, County of San Joaquin, which is within the geographic territory of the Sacramento Division of this Court.

There is no dispute as to jurisdiction or venue.

## II.    JURY OR NON-JURY TRIAL

Pursuant to a stipulation entered into between the parties, Defendant withdraws its demand for a trial by jury, and the matter is therefore planned for a non-jury trial.

## III.   UNDISPUTED FACTS

### The Theatre Lease

1. Defendant is the owner and landlord of the retail commercial complex in Manteca, California, known as The Promenade Shops at Orchard Valley.

2. At all relevant times, Kerasotes Showplace Theatres, LLC ("Kerasotes") was a theatre exhibition company that entered into that certain "Shopping Center Cinema Lease," dated August 17, 2007, (the "Lease") with Defendant to operate a theatre in the Shopping Center.

3. Defendant and Kerasotes finalized and executed the Lease with an effective date of August 17, 2007.

4. The Lease defines the Shopping Center as "a retail commercial complex known as The Promenade Shops at Orchard Valley."  JCPenney and Hampton Inn are located in the Shopping Center, but are on separately owned parcels.

5. There were four modifications of the Lease.

6. Section 7.1 of the Lease, as relevant here, states:

> Tenant shall pay, pursuant to the terms hereof, Tenant's proportionate share of the taxes, user fees, land use exactions, and other public charges, expenses, fees or levies now or hereafter assessed against the real estate included in the Leased Premises by any governmental authority or any school or agricultural, utility, drainage or other improvement or special assessment district during the Lease Term, all of which are herein collectively referred to as 'Property Taxes.'

\* \* \* \* \*

> 'Property Taxes' shall include any special assessment resulting, in whole or in part, from capital improvements for the entire tax district, including Community Facilities District, of which the Shopping Center is a part and which benefit the Shopping Center.
>
> * * * * *
>
> Tenant's proportionate share of Property Taxes shall equal the product of the total Property Taxes due with respect to the land and improvements included in the applicable tax parcel (the 'Tax Parcel') multiplied by a fraction, the numerator of which shall be the GLA [Gross Leasable Area] of the Leased Premises and the denominator of which shall be the GLA of all improvements included in the Tax Parcel.

7. Section 22.3 of the Lease states: "**Entire Agreement**: Except as may be specifically referred to herein, there are no covenants, promises, agreements, conditions or understandings, either oral or written, between the parties hereto, other than as herein set forth. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them. This instrument shall supersede any and all prior agreements of the parties hereto with respect to the subject matter hereof."

8. Section 22.19 of the Lease states: "**Consents**: The parties agree to act in good faith and with fair dealing with one another in the execution, performance and implementation of the terms and provisions of this Lease. Whenever the consent, approval or other action of a party is required under any provision of this Lease, such consent, approval or other action shall not be unreasonably withheld, delayed or conditioned by a party unless the provision in question expressly authorizes such party to withhold or deny consent or approval or decline to take action in accordance with a different standard, in which case the consent or approval or the decision to not take action may be withheld, delayed or conditioned in accordance with the different standard (any provision indicating that consent is not to be unreasonably withheld is to be interpreted to mean that consent shall not be unreasonably withheld, delayed or conditioned)."

9. Section 22.4 of the Lease states: "**Attorney Fees**: If suit or action is commenced to enforce compliance with any term, covenant or condition of this Lease, including any action undertaken in the context of bankruptcy proceedings, the party not prevailing shall pay to the

3

prevailing party a sum which the trial judge determines is reasonable as attorney fees to be allowed in the suit or action, and court costs, and if appeal is taken from any judgment or decree in the suit or action, the party not prevailing on the appeal shall pay to the prevailing party such further sum as the appellate court shall adjudge reasonable as attorney fees on appeal, and court costs."

10. The term "Tax Parcel" is defined in the Lease as "the land and improvements included in the applicable tax parcel."

**Kerasotes Assigns Theatre Lease to Plaintiff**

11. On November 7, 2008, Kerasotes began operating a theater in the Shopping Center.

12. On May 24, 2010, Plaintiff notified Defendant that it had completed its acquisition of the Kerasotes ShowPlace group of theatres and that Plaintiff was the tenant under the Lease. In connection with the transaction, Kerasotes assigned the Lease to Plaintiff under an Assignment and Assumption Agreement.

13. Plaintiff is the current tenant under the Lease.

**The Theatre's Original Tax Parcel**

14. When the Shopping Center was originally constructed, it consisted of twelve tax parcels (including an easement area).

15. Kerasotes took occupancy of the theatre premises under the Lease on or about November 7, 2008.

**New Tax Parcel 41**

16. On February 2, 2009, the San Joaquin County Assessor mailed a letter to Defendant stating that the County "will be splitting [Plaintiff's leased premises] off as a separate parcel." The letter was sent to Joshua Poag, on behalf of Defendant. In its letter, the County requested from Defendant a detailed drawing of the actual leased premises of the theatre by February 28, 2009.

17. In 2009, the County remapped the Shopping Center, and changed the Shopping Center's composition from 12 tax parcels to 26 smaller parcels. As part of that remapping, the

4

1   County created a separate parcel for the property on which the theatre sits.

2         18.    Parcel No. 41 included only the footprint of the theatre building.

3   **The Community Facilities District Improvements**

4         19.    On April 2, 2007, Defendant entered into an Acquisition Agreement with the City
5   of Manteca.  The Acquisition Agreement has five amendments: 1) First Amendment to
6   Acquisition Agreement executed on December 31, 2008; 2) Second Amendment to Acquisition
7   Agreement executed on October 6, 2009; 3) Third Amendment to Acquisition Agreement
8   executed on December 21, 2010; 4) Fourth Amendment to Acquisition Agreement executed on
9   December 20, 2011; and 5) Amended and Restated Acquisition Agreement executed on October
10  16, 2012. The Acquisition Agreement was regarding the creation of a Community Facilities
11  District ("CFD"), a special district created by a local government to enable bonds to be issued to
12  finance construction of public improvements benefitting the district.

13        20.    A CFD is a legislatively created alternative method of funding in California,
14  designed to circumvent limitations on funding created by Proposition 13, and to levy "Special
15  Taxes" or taxes raised for a specific purpose, such as public improvements.  The terms "Mello-
16  Roos tax," "CFD tax," and "Special Assessment" may be used interchangeably.

17        21.    In May of 2013, a Community Facilities District was created as Community
18  Facilities District No. 2012-02 (the "Manteca CFD").

19        22.    The CFD's improvements were intended to benefit the entire Shopping Center.

20  **Defendant Assigns Square Footage To Pay the CFD**

21        23.    Plaintiff's theatre occupies 67,212 square feet of improvements at the Shopping
22  Center.

23        24.    Per the Official Statement for the Issuance of the CFD, the California Statewide
24  Communities Development Authority Community Facilities District No. 2012-02 (Manteca
25  Lifestyle Center) - CFD Tax Administration Report Fiscal Year 2013-14, the Resolution of
26  Formation, and the Rate and Method of Apportionment, the maximum special assessment tax that
27  can be levied in the Shopping Center CFD (to pay the yearly principal and interest on the bonds)
28  is $3.70 per square foot of developed space (the "Maximum Rate Threshold").  The Maximum

Rate Threshold is subject to a 2% annual increase.

**Amounts Paid By Plaintiff**

25. From the opening of the Shopping Center in 2008 through June 23, 2014, Defendant billed Plaintiff, and Plaintiff paid, a percentage of the Shopping Center's Property Taxes that was based on the theatre's proportionate share of the gross leasable area of improvements of the entire Shopping Center, less separately owned parcels.

26. By letter dated June 23, 2014, Defendant told Plaintiff that the County Assessor had, in 2009, remapped the property parcels and that, as a result of this change, Plaintiff's building was now on a separate tax parcel — identified as Parcel No. 41 — and further informed Plaintiff that the CFD was created in May 2013. Defendant also informed Plaintiff that the enclosed tax bill applicable to Plaintiff's building would now include a line item for the recently created CFD, resulting in an increase in the tax expense subject to Plaintiff's reimbursement.

27. On November 4, 2014, Defendant's General Counsel, Robert Rogers, sent a Notice of Default to Plaintiff for its failure to pay increases in Common Area Maintenance ("CAM") charges, the 2013 CAM and Real Estate Reconciliations, the January-June 2014 Real Estate Taxes, and the November 2014 Base Rent and Variable CAM for an outstanding balance including interest of $561,546.57.

28. On November 12, 2014, Plaintiff began paying, under protest and while reserving its rights, the CFD Assessments.

29. Defendant billed Plaintiff for approximately 67% of the Shopping Center's CFD assessments, and Plaintiff paid Defendant the following amounts:

    a. 2013/2014 CFD assessment:  Plaintiff paid $232,232.78.

    b. 2014/2015 CFD assessment:  Plaintiff paid $238,788.20.

    c. 2015/2016 CFD assessment:  Plaintiff paid $244,797.08.

    d. 2016/2017 CFD assessment:  Plaintiff paid $247,174.92.

    e. 2017/2018 CFD assessment:  Plaintiff paid $252,685.74.

    f. 2018/2019 CFD assessment:  Plaintiff paid $257,907.34.

    g. 2019/2020 CFD assessment:  Plaintiff paid $262,743.36.

        h.    2020/2021 CFD assessment:  Plaintiff paid $267,290.20.

        i.    2021/2022 CFD assessment:  Plaintiff paid $271,740.62.

## IV.   DISPUTED FACTUAL ISSUES

### A.   Plaintiff

1. Whether the applicable tax parcel is the entire Shopping Center, less separately owned parcels, or just Parcel 41.

2. On May 10, 2007, three months before the Lease was executed, a development agreement was recorded, which contained an agreement among Defendant and the City of Manteca concerning the development of the Shopping Center (the "Development Agreement").

3. Pursuant to Section 9.1 of the Development Agreement: "Developer [Defendant] may submit a petition to City for the creation of a Community Facilities District ('CFD') under the Mello-Roos Community Facilities Act of 1982, as amended, and the issuance of CFD bonds for the financing of a portion of the Public Infrastructure Improvements set forth in Exhibit C . . . the parties will work diligently to structure and the City Manager will support the formation of such a district . . . to fund the construction of eligible improvements set forth in Exhibit C."

4. From 2008 through 2014, when determining taxes and assessments to be reimbursed under Section 7.1 of the Lease, Defendant, Kerasotes, and Plaintiff identified the Shopping Center, less separately owned parcels, as the applicable tax parcel.

5. At the commencement of the Lease on November 7, 2008 through 2014, Kerasotes, and subsequently Plaintiff, paid its proportionate share of Property Taxes, equal to approximately 17% of the taxes assessed for the entire Shopping Center, not including the parcels separately owned by JCPenney and Hampton Inn.

6. The proportionate share of the theatre's Property Taxes was based on the numerator being the gross leasable area of the theatre (67,212 square feet), and the denominator being the gross leasable area of all improvements in the applicable tax parcel (392,334 square feet).

7. At the time the Shopping Center was re-parceled in 2009, Defendant did not inform Kerasotes that the County had created a new separate parcel for the property on which the

1 theater was located.

2     8.    Despite the Shopping Center having been re-parceled in 2009, Kerasotes, and then Plaintiff, continued to pay its proportionate share of Property Taxes based on the proportion of the theatre's square footage in the Shopping Center, less separately owned parcels.

    9.    From 2008 through 2014, Defendant continued to treat the applicable tax parcel as the entire Shopping Center, less separately owned parcels.

    10.    The CFD's improvements are intended, as set forth in the 2007 Development Agreement, as "improvements reasonably required to service and operate a commercial project such as the Project on the Project site."

    11.    The CFD was created to finance improvements required by the City, as a condition to the development of the Shopping Center, and included:

    (a)    Public "ring" streets

    (b)    Public entrances

    (c)    Storm drains

    (d)    Sewer lines

    (e)    Water lines

    (f)    Landscaped areas

    (g)    Lake construction, earthwork/grading, lighting, landscape and irrigation

    (h)    Irrigation line relocation

    (i)    Impact fees for water, sewer, drainage, transportation, government building facilities, major equipment purchases, San Joaquin County transportation, fire department, water meter, and surface water

    12.    The CFD was originally created to include 512,940 square feet of improvements, which would support a CFD bond issuance in an amount not to exceed $25,000,000.

    13.    Although Defendant initially contemplated constructing 512,940 total square feet of improvements in the Shopping Center, Defendant only constructed 392,334 square feet of improvements, excluding separately owned parcels.

///

///

14. At all relevant times, 218,319 square feet of improvements have been leased, leaving 174,015 square feet of vacant improvements.

15. Defendant was required under the terms of the Resolution of Formation to allocate sufficient square footage of improvements at the Shopping Center to pay the CFD special tax requirement for fiscal year 2013-14 in an amount equal to $346,625.

16. The $346,625 was to be used to pay principal and interest payments on the CFD bonds as well as administrative expenses.

17. To select the adequate square footage to secure the bonds, Defendant analyzed the leases of the tenants at the Shopping Center, and selected square footage as collateral for the bond issuance based on (1) whether the spaces were leased, and (2) whether the tenants had lease provisions allowing Defendant to pass through the CFD assessments.

30. To comply with the requirements of the CFD, in 2013, Defendant designated as collateral for the repayment of the bonds the following ten spaces at the Shopping Center:

| Space Number | Tenant Name | Floor Area (Sq. Footage) |
| --- | --- | --- |
| 385 | Vans | 4,131 |
| 390 | Guess | 6,402 |
| 600 | PLAINTIFF Theater | 67,212 |
| 610 | Matsu Sushi | 2,350 |
| 620 | Subway | 1,004 |
| 630 | Crush Frozen Yogurt | 1,400 |
| 675 | Manteca Visitor's Bureau | 1,889 |
| 680 | Fabulous Nails | 1,850 |
| 805 | Banana Republic | 8,281 |
| Pad H | Red Robin | 5,800 |
| **TOTALS:** | | **100,319** |

18. On March 27, 2013, Defendant's General Counsel, Robert Rogers, sent a tax commencement letter ("2013 Tax Commencement Letter") to the California Statewide Communities Development Authority identifying the buildings and the assessor's parcel numbers to be subject to the special assessment of the CFD starting with fiscal year 2013-2014 and continuing each year thereafter until otherwise no longer levied or terminated.

19. Of the total 392,334 square feet of improvements at the Shopping Center, Defendant designated 100,319 square feet of improvements as collateral for the bond issuance.

20. At all relevant times, Bass Pro Shop leased 118,000 square feet of improved space at the Shopping Center.

21. Defendant did not designate Bass Pro Shop's square footage as collateral for the bond issuance.

22. Defendant was only permitted, under the terms of its lease with Bass Pro Shop, to pass through Bass Pro Shop's pro rata share of any increase in CFD assessments over and above the amount of such CFD assessment for the year in which the Commencement Date occurs (up to a maximum increase of five percent (5% per year).

23. In May 2013, the CFD for the Shopping Center issued bonds in the reduced amount of $6,250,000.

24. As a result of Defendant's decision to designate 100,319 square feet of improvements, instead of 392,334 square feet of improvements in the Shopping Center, Plaintiff was billed 67% of the CFD assessment, as a consequence of it occupying 67,212 square feet of improvements.

25. On March 18, 2014, Defendant's Senior Vice President, Asset Management, Alisia Kempe, sent a Tax Commencement Letter to the California Statewide Communities Development Authority identifying an additional building and the assessor's parcel number with 4,265 square feet to be subject to the special tax of the CFD starting with fiscal year 2014-2015 and continuing each year thereafter until otherwise no longer levied or terminated.

26. By 2014, Defendant had designated 104,584 square feet of improvements as collateral for the bond issuance. Defendant continued to bill Plaintiff for the CFD assessment in

an amount equivalent to 67% of the total CFD assessment for the Shopping Center, less the separately owned parcels.

27. After informing Plaintiff that its parcel had been remapped on June 23, 2014, Defendant thereafter began calculating Plaintiff's proportionate share of CFD assessments due based on the amount of square footage of Parcel 41 that Defendant allocated for CFD assessments.

**B.     Defendant**

1. Whether Defendant performed as contemplated under the Lease.

2. Whether Plaintiff as successor-in-interest to Kerasotes (the "Original Tenant") is charged with the actions, conduct, statements and admissions of Kerasotes.

3. Whether Plaintiff waived its right to recover past CFD Special Tax payments because it voluntarily made payments on the CFD assessments.

4. Whether Defendant's threat of a default under the Lease constitutes sufficient duress for Plaintiff to recover past payments for CFD assessments as damages.

5. Whether Plaintiff's effort to make CFD Special Tax payments "under protest" is authorized under the Lease.

6. Whether Plaintiff waived its right to recover past CFD Special Tax payments because it delayed in filing this lawsuit.

7. Whether Plaintiff's acceptance of real estate tax calculations based on its own tax parcel is course of performance that Plaintiff treated the applicable tax parcel as its own tax parcel.

8. Whether Plaintiff waived its right to challenge the calculation of CFD assessments, based on its proportionate share of its own tax parcel, because it never challenged the calculation of property taxes based on its own tax parcel.

9. Whether Plaintiff waived its right to challenge the calculation of CFD assessment, based on its proportionate share of its own tax parcel, because it accepted Defendant's offer of a refund on overpayments on taxes once Defendant started calculating Plaintiff's taxes based on Plaintiff's own tax parcel.

///

10. Whether Defendant's billing of Property Taxes prior to June 23, 2014 was course of performance regarding the term Tax Parcel.

11. Whether the property manager for Defendant overlooked through an oversight and/or inadvertence that the theater building had been separately assessed.

12. Whether Plaintiff's delivery of the Unit Purchase Agreement to the San Joaquin County Tax Assessor's Office is course of performance evidence that the Tax Parcel is Parcel 41.

13. Whether the term "Tax Parcel" can have a meaning inconsistent with Plaintiff's tax parcel since both parties agree that real estate tax purposes are calculated based on Plaintiff's tax parcel.

14. Whether Plaintiff is not in privity with the Rate and Method of Apportionment to the CFD, the contract that creates the right to send Tax Commencement Letters, and therefore barred from asserting a breach of the covenant of good faith and fair dealing.

15. Whether the letter of intent is relevant parol evidence for interpreting the terms applicable tax parcel and Tax Parcel under the Lease.

16. Whether the letter of intent is course of dealing evidence for interpreting the terms applicable tax parcel and Tax Parcel under the Lease.

17. Whether Plaintiff was deprived of the benefits of the bargain in the Lease where Plaintiff is paying the amount of taxes, including CFD Special Tax, that is equivalent to what was set forth in the letter of intent.

18. Whether Plaintiff was damaged where Plaintiff is paying the amount of taxes, including CFD Special Tax, that is equivalent to what was set forth in the letter of intent.

19. Whether the CFD Resolution of Formation and the Mello-Roos Community Facilities Act of 1982 bar the relief requested by Plaintiff.

20. Whether Plaintiff's tax appeal of its own parcel is course of performance regarding the applicable tax parcel.

21. Whether Plaintiff's acceptance of a refund on the overpayment of real estate taxes is course of performance that Plaintiff treated the applicable tax parcel as its own tax parcel.

///

22. Whether Kerasotes' payment of $5.00 per square foot ("PSF") for the first year of the Lease is course of performance by Original Tenant that it had to pay CFD Special Taxes.

23. Whether using the entire Shopping Center, as Plaintiff contends, or Plaintiff's separate parcel, as Defendant contends, is "objectively unreasonable" or "within the reasonable contemplation of the parties at the time of the formation" of the Lease.

24. Whether Plaintiff ever sought temporary relief from forfeiture of the lease until the issue of CFD Special Taxes was judicially determined, pursuant to Cal Rev & Tax Code § 5097 and § 5140.

25. Whether Plaintiff is barred from recovery of past CFD Special Taxes by reason of its failure to seek temporary relief under Cal Rev & Tax Code § 5097 and § 5140.

26. Whether Plaintiff has any right to bring a contract action seeking rights to the Development Agreement and Amended and Restated Acquisition Agreement, when those agreements clearly state that no third party has any rights.

27. Whether the request by Kerasotes to do a tax appeal was an admission that Parcel 41 was the applicable tax parcel.

28. Whether the tax appeal filed by Plaintiff was an admission that Parcel 41 was the applicable tax parcel.

29. Whether Defendant's billing of Property Taxes prior to June 23, 2014 was course of performance regarding the term Tax Parcel.

## V. DISPUTED EVIDENTIARY ISSUES & MOTIONS IN LIMINE

The Court sets a filing deadline for motions in limine of May 16, 2022, with opposition briefs due by May 23, 2022, so that the motions can be heard and decided and the parties can have enough time to engage in settlement negotiations before trial begins. Plaintiff identifies the following evidentiary issues that may be subject to a motion in limine:

1. Parol evidence related to the Letter of Intent, including testimony regarding the Letter of Intent, is not relevant to this litigation or the interpretation of the unambiguous terms of the Lease and its introduction will result in an undue consumption of time. (*See* ECF No. 69 at 8.)

  2. All documents or testimony of Defendant's "mistaken" billing practices is inadmissible because mistake is an affirmative defense and Defendant failed to plead it in its response. Further, only expressed intent is admissible, not uncommunicated beliefs. The introduction of such evidence will result in an undue consumption of time.

  3. Defendant's estimate of $5 of tax per square foot of leased space is not relevant to this litigation, and is inadmissible parol evidence.

  4. The admissibility of settlement communications.

  5. Third party financial statements for the theatre, including the PJ Solomon Report, are hearsay and are not relevant to this litigation. The introduction of such evidence will result in an undue consumption of time.

  6. Plaintiff disputes that its tax appeal is relevant to this litigation and its introduction will result in an undue consumption of time.

  7. Plaintiff disputes that the lease abstracts created by third parties is relevant to this litigation, and they are hearsay. The introduction of such evidence will result in an undue consumption of time.

  8. Plaintiff intends to file a motion to exclude all or part of Mr. DiGeronimo's expert opinions.

Defendant's identifies the following evidentiary issues that may be subject to a motion in limine:

  1. Information and argument concerning third party leases and communications with third party tenants at the Shopping Center.

  2. Inclusion of the CFD documents, while relevant for assisting the trier of fact with background information about the CFD, is not relevant to the current proceeding and Plaintiff has no third party rights under the Amended and Restated Acquisition Agreement or the Development Agreement.

  3. Testimony of Sarah Sanchez for Plaintiff. Plaintiff never disclosed Ms. Sanchez in its Initial Disclosures or in any of the extensive discovery exchanged between the parties, and Ms. Sanchez was never deposed or otherwise subject to a subpoena.

///

4. The admissibility of settlement communications, discussions, and analysis conducted by Defendant regarding settlement proposals from Plaintiff.

## VI. **WITNESSES**

The parties' lists of prospective witnesses have been memorialized in the parties' Exhibit A to the Joint Final Pretrial Conference Statement and are thus incorporated herein.

No other witnesses will be permitted to testify unless: (1) the party offering the witness demonstrates that the witness is for the purpose of rebutting evidence which could not be reasonably anticipated at the Final Pretrial Conference, or (2) the witness was discovered after the Final Pretrial Conference and the proffering party makes the showing required in section B below.

Upon the post-pretrial discovery of witnesses, the attorney shall promptly inform the Court and opposing parties of the existence of the unlisted witnesses so that the Court may consider at trial whether the witnesses shall be permitted to testify. The evidence will not be permitted unless: (1) the witnesses could not reasonably have been discovered prior to pretrial; (2) the Court and opposing counsel were promptly notified upon discovery of the witnesses; (3) if time permitted, counsel proffered the witnesses for deposition; and (4) if time did not permit, a reasonable summary of the witnesses' testimony was provided by opposing counsel.

## VII. **EXHIBITS — SCHEDULES AND SUMMARIES**

The parties' lists of proposed exhibits have been memorialized in the parties' Exhibit B to the Joint Final Pretrial Conference Statement and are thus incorporated herein.

**Plaintiff's exhibits shall be listed numerically. Defendant's exhibits shall be listed alphabetically.** The parties shall use the standard exhibit stickers provided by the Court Clerk's Office: pink for Plaintiffs and blue for Defendants. After three letters, note the number of letters in parenthesis (i.e., "AAAA(4)") to reduce confusion during the trial. All multi-page exhibits shall be fastened together and each page within the exhibit shall be numbered. All photographs shall be marked individually. The list of exhibits shall not include excerpts of depositions which may be used to impeach witnesses.

///

Each party may use an exhibit designated by the other.  In the event that Plaintiff and Defendant offer the same exhibit during trial, that exhibit shall be referred to by the designation the exhibit is first identified.  The Court cautions the parties to pay attention to this detail so that all concerned will not be confused by one exhibit being identified with both a number and a letter.

A. The Court will not permit introduction of other exhibits unless: (1) the party proffering the exhibit demonstrates that the exhibit is for the purpose of rebutting evidence which could not be reasonably anticipated at the Pretrial Scheduling Conference, or (2) the exhibit was discovered after the Pretrial Scheduling Conference and the proffering party makes the showing required in paragraph "B" below.

B. Upon the post-pretrial discovery of exhibits, the attorneys shall promptly inform the Court and opposing counsel of the existence of such exhibits so that the Court may consider at trial their admissibility.  The exhibits will not be received unless the proffering party demonstrates: (1) the exhibits could not reasonably have been discovered prior to pretrial; (2) the Court and counsel were promptly informed of their existence; (3) counsel forwarded a copy of the exhibit(s) (if physically possible) to opposing counsel.  If the exhibit(s) may not be copied, the proffering counsel must show that he or she has made the exhibit(s) reasonably available for inspection by opposing counsel.

C. As to each exhibit, each party is ordered to exchange a copy identical to the Court's copy, or other reproduction of the exhibit(s) in a three-ring binder(s) **no later than one week before trial.**

D. The attorney or representative for each party is directed to present one copy of the exhibit(s) and exhibit list to the Court Clerk's Office, **no later than 3:00 p.m., one week before trial**, or at such earlier time as may be ordered by the Court.  The Court shall be presented with a copy of the exhibit(s) in a 3-ring binder(s) with a side tab identifying each exhibit by number or letter. Each binder shall be no larger than three inches in width and have an identification label on the front and side panel.

E. It is the duty of counsel to ensure that witnesses have access to a copy of exhibit(s) if needed.

## VIII. DISCOVERY DOCUMENTS

Plaintiff intends to offer portions of the following depositions and other discovery at trial:

- Defendant's Initial Disclosures Pursuant to F.R.C.P. 26(a)(1), dated August 15, 2016
- Defendant's Answers to Plaintiff's First Set of Interrogatories, dated November 14, 2016
- Defendant's Answers to Plaintiff's Second Set of Interrogatories, dated March 9, 2016
- Deposition of Alesia Kempe – Defendant
- Deposition of Bud Moll – formerly Defendant
- Deposition of Ross Schram – former counsel for Defendant
- Deposition of Lisa Shipowitz – Defendant
- Deposition of Caryn Englander – former counsel for Kerasotes Showplace Theatres, LLC
- Deposition of Robert Gallivan – Kerasotes Showplace Theatres, LLC
- Deposition of Michael DiGeronimo – Defendant's expert

Plaintiff reserves the right to offer additional deposition testimony and/or other discovery documents at trial for impeachment or rebuttal purposes.

Defendant intends to offer portions of the following depositions and other discovery at trial:

- Plaintiff's Complaint filed against Defendant, dated May 18, 2016
- Plaintiff's Initial Disclosures Pursuant to F.R.C.P. 26(a)(1), dated August 15, 2016
- Plaintiff's Answers to Defendant's First Set of Interrogatories, dated December 1, 2016
- Plaintiff's Responses to Defendant's First Set of Document Demands, dated December 1, 2016
- Plaintiff's Responses to Defendant's Second Set of Document Demands, dated April 6, 2017

- Deposition of Alesia Kempe – formerly Defendant
- Deposition of Bud Moll – formerly Defendant
- Deposition of Ross Schram – former counsel for Defendant
- Deposition of Lisa Shipowitz – Defendant
- Deposition of Ron Herman – Plaintiff
- Deposition of Caryn Englander – former counsel for Kerasotes Showplace Theatres, LLC
- Deposition of Robert Gallivan – Kerasotes Showplace Theatres, LLC
- Deposition of Michael DiGeronimo – Defendant's expert
- Deposition of Charles Hansen – Plaintiff's expert

Defendant reserves the right to offer additional deposition testimony and/or other discovery documents at trial for impeachment or rebuttal purposes.

## IX.     FURTHER DISCOVERY OR MOTIONS

Pursuant to the Court's Pretrial Scheduling Order, all discovery and law and motion was to have been conducted so as to be completed as of the date of the Final Pretrial Conference. That Order is confirmed. The parties are free to engage in informal agreements regarding discovery and law and motion matters. However, any such agreements will not be enforceable in this Court.

## XI.     AGREED STATEMENTS — JOINT STATEMENT OF CASE

The Court notes the parties did not submit a joint statement of the case in the Joint Pretrial Statement. It is mandatory the parties shall file one short joint statement of the case concerning the nature of this case that will be read to the jury at the commencement of trial. **The parties shall file the statement no later than one week before first day of trial**. The statement of the case shall include in plain concise language Plaintiff's claims and the corresponding defenses to the claims.

## XIII.     AUDIO/VISUAL EQUIPMENT

The parties are required to notify the Courtroom Deputy Clerk, Michele Krueger, **twenty-one (21) days before trial**, if they wish to reserve and arrange for orientation with all parties on

the Court's mobile audio/visual equipment for presentation of evidence. There will be one date and time for such orientation.

### XIV. DATE AND LENGTH OF TRIAL

Trial is scheduled for **Monday, June 6, 2022**. The estimated length of trial is 4 days. Counsel are to email Michele Krueger, Courtroom Deputy Clerk, at mkrueger@caed.uscourts.gov or call 916-930-4163 by **May 9, 2022,** to ascertain the status of the trial date.

### XV. OBJECTIONS TO PRETRIAL ORDER

Each party is granted **fourteen (14) days** from the entry of this Final Pretrial Order to object to any part of the order or to request augmentation to it. A Final Pretrial Order will be modified only upon a showing of manifest injustice. If no objection or modifications are made, this Order will become final without further order of the Court and shall control the subsequent course of the action, pursuant to Rule 16(e) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

**DATED: July 26, 2022**

Troy L. Nunley
United States District Judge

19