1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                            EASTERN DISTRICT OF CALIFORNIA

10

11   AMERICAN MULTI-CINEMA, INC., a           Case No. 2:16-cv-01066-TLN-KJN
     Missouri corporation,
12
                         Plaintiff,           **FINDINGS OF FACT AND**
13                                            **CONCLUSIONS OF LAW**
     v.
14
     MANTECA LIFESTYLE CENTER, LLC,
15   a Delaware limited liability company,

16                       Defendant.

17

18          The Court held a bench trial in the instant matter on July 26, 2022 to July 28, 2022.

19   Having considered the evidence presented at trial and the parties' proposed findings of fact and

20   conclusions of law submitted after trial, the Court sets forth the following findings of fact and

21   conclusions of law, in accordance with Federal Rule of Civil Procedure 52(a).[1]

22   ///

23   ///

24   ///

25   ///

26   _____

     [1]      Any finding of fact that may be construed as a conclusion of law is hereby also adopted as
27   a conclusion of law.  Likewise, any conclusion of law that may be construed as a finding of fact is
     hereby also adopted as a finding of fact.  *See, e.g.*, *ProMex, LLC v. Hernandez*, 781 F. Supp. 2d
28   1013, 1016, 1019 (C.D. Cal. 2011).

**FINDINGS OF FACT**

After consideration of the parties' trial briefs and the evidence submitted, the Court determines that the following facts have been established in this case:

**I.      JURISDICTION/VENUE.**

1.      Plaintiff AMC ("AMC" or "Plaintiff") filed the Complaint in this action on May 19, 2016, alleging claims for breach of contract and breach of the covenant of good faith and fair dealing, as well as seeking declaratory relief.

2.      The Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship.  [Amended Final Pretrial Order (ECF No. 112) ("AFPO"), p. 1.]

3.      Venue is appropriate in the Eastern District of California, Sacramento Division, because the Lease (as defined herein below) was executed within the geographic territory of the Sacramento Division of this Court and was to be performed by the City of Manteca, County of San Joaquin, which is within the geographic territory of the Sacramento Division of this Court. [AFPO, p. 1.]

**II.     AMC ASSUMES KERASOTES LEASE.**

4.      Defendant Manteca Lifestyle Centre, LLC ("Manteca" or "Defendant") is owner and landlord of the retail commercial complex in Manteca, California, known as the Promenade Shops at Orchard Valley. [UF* 1.]

5.      Kerasotes Showplace Theatres, LLC ("Kerasotes") entered into a lease with Manteca to be a tenant at the Shopping Center dated August 17, 2007 (the "Lease"). [UF 2.]

6.      Prior to Kerasotes entering into the Lease, one of the parcels in the Shopping Center was sold to Hampton Inn, and a second parcel, as well as a parking lot, was sold to JCPenney.** [Shipowitz testimony, Trial Transcript ("TT") 294:7-21.]

---

* UF refers to the undisputed facts in § III of the Court's July 26, 2022 Amended Final Pretrial Order (ECF No. 112).

** The "Shopping Center" is hereinafter defined as the retail commercial complex known as The Promenade Shops at Orchard Valley, minus the sold off parcels.

7.      Kerasotes took occupancy of the theatre premises at the Shopping Center under the Lease on or about November 7, 2008. [UF 11.]

8.      The Lease has a 20-year term, with an additional four 5-year options. [Trial Exhibit ("Ex.") 1.]

9.      The Lease is a fully integrated document, containing an integration clause in Paragraph 22.3. [Ex. 1.]

10.     The Lease contains a non-waiver provision in Paragraph 15. [Ex. 1.] A representative for Manteca further testified that "[t]here's nothing in the [L]ease requiring [tenant] to complain within a certain period of time." [Shipowitz TT 406:18-20.]

11.     On May 24, 2010, AMC purchased Kerasotes theatres and notified Manteca that AMC had assumed the Lease. [UF 12; Ex. 22.]

12.     AMC is the current theatre tenant under the Lease. [UF 13.]

**III.   SECTION 7.1 OF THE LEASE DEFINES AMC'S OBLIGATION TO REIMBURSE MANTECA FOR ITS "PROPORTIONATE SHARE" OF PROPERTY TAXES.**

13.     Section 7.1, provides, in relevant part:

Tenant shall pay, pursuant to the terms hereof, Tenant's proportionate share of the taxes, user fees, land use exactions, and other public charges, expenses, fees or levies now or hereafter assessed against the real estate included in the Leased Premises by any governmental authority or any school or agricultural, utility, drainage or other improvement or special assessment district during the Lease Term, all of which are herein collectively referred to as 'Property Taxes.'

* * * * *

'Property Taxes' shall include any special assessment resulting, in whole or in part, from capital improvements for the entire tax district, including Community Facilities District, of which the Shopping Center is a part and which benefit the Shopping Center.

* * * * *

Tenant's proportionate share of Property Taxes shall equal the product of the total Property Taxes due with respect to the land and improvements included in the applicable tax parcel (the 'Tax Parcel') multiplied by a fraction, the numerator of which shall be the GLA [Gross Leasable Area] of the Leased Premises and the denominator of which shall be the GLA of all improvements included in the Tax Parcel. [Ex. 1.]

/ / /

14.     Manteca is the sole party responsible to pay all Property Taxes, including CFD assessments, at the Shopping Center. [Shipowitz TT 202:22-203:13; Herman TT 70:4-12; Ex. 120-4.]

15.     Manteca may only bill its tenants for reimbursement of Property Taxes, to the extent it is allowed to do so in each tenant's respective lease. [Shipowitz TT 202:22-203:13; Kempe deposition testimony, 60:23-61:07; 61:21-24; 66:14-18.]

16.     AMC is obligated under § 7.1 of the Lease to reimburse Manteca for its "proportionate share" of "Property Taxes." [Ex. 1, § 7.1; Ex. 76; Shipowitz TT 206:11-24.]

17.     "Property Taxes" is defined in § 7.1 of the Lease, to include Community Facilities District Assessments ("CFD Assessments"). [Ex. 1, § 7.1; Ex. 76.]

18.     Under § 7.1 of the Lease, the definition of the "Tax Parcel" is the same as "applicable tax parcel." [Ex. 1, § 7.1; Shipowitz TT 211:23-213:23.]

19.     "Tax Parcel" is defined in § 7.1 of the Lease as "Tenant's proportionate share of Property Taxes shall equal the product of the total Property Taxes due with respect to the land and improvements included in the applicable tax parcel (the "Tax Parcel")." [Ex. 1, § 7.1.]

20.     The defined term "Property Taxes" is used two times in the definition of "Tax Parcel" in § 7.1. [Ex. 1, § 7.1.]

21.     To determine the definition of "Tax Parcel," one must understand the defined term "Property Taxes." [Ex. 1, § 7.1.]

22.     "Property Taxes" is defined as "including any special assessment resulting, in whole or in part, from capital improvements for the entire tax district, including Community Facilities District, of which the Shopping Center is a part and which benefit the Shopping Center." [Ex. 1, § 7.1; Ex. 76.]

23.     Incorporating the definition of "Property Taxes" into the definition of "Tax Parcel" creates the following definition of "Tax Parcel" – the land and improvements where the total taxes are due for the entire tax district. [Ex. 1, § 7.1.]

/ / /

/ / /

## IV. THE FORMULA TO REIMBURSE MANTECA FOR ITS PROPORTIONATE SHARE OF PROPERTY TAXES IN § 7.1 IS UNAMBIGUOUS.

### A. All of the Witnesses Testified that § 7.1 Is Unambiguous.

24. Manteca's expert, Michael DiGeronimo, testified that § 7.1 of the Lease is unambiguous. [DiGeronimo TT 335:17-336:13.]

25. Ms. Shipowitz, the person Manteca designated as most knowledgeable about § 7.1, testified that § 7.1 of the Lease is unambiguous. [Shipowitz TT 207:5-10.]

26. Ms. Shipowitz confirmed at trial that the "tax district" is the total Shopping Center, minus the sold off parcels.  (Shipowitz TT 201:16-17; Ex. 122.)

27. Ross Schram was Manteca's lawyer who negotiated and drafted the Lease. [Schram testimony, 11:15-20; Shipowitz TT 198:7-9.]

28. Attorney Schram testified that the term "Tax Parcel," as he used the term in § 7.1 of the Lease, was the entire Shopping Center, minus the sold off parcels. [Schram testimony, 47:22-48:12.]

29. Attorney Schram, explained that because the "Tax Parcel" could change over time as parcels in the Shopping Center were sold off, he decided to define Tax Parcel as where the "total Property Taxes are due for the entire tax district." [Schram testimony, 37:16-38:21.]

30. Attorney Schram explained that he used this definition of Tax Parcel, because, as portions of the Shopping Center were sold, the Tax Parcel would be the remaining land and improvements where "the total property taxes are due." [Schram testimony, 37:16-38:21.]

31. Attorney Schram explained that he did not attach a site plan exhibit as an appendix to the Lease identifying the Tax Parcel because, "at the time that this lease was done," there were a number of potential sales transactions contemplated by Manteca that could have reduced the size of the Tax Parcel. [Schram testimony, 37:22-38:21.]

32. Attorney Schram testified that "Tax Parcel" was not the parcel where AMC was located. [Schram testimony, 46:3-9.]

33. The land where AMC was situated was already defined in the Lease as the "Leased Premises." [Ex. 1, § 7.1; Schram testimony, 45:17-24.]

**B.**    **The November 21, 2014 Letter Sent By Manteca to AMC Confirms that the Lease Was Unambiguous.**

34.    On November 21, 2014, five months after Manteca notified AMC that it would be billed for CFD assessments on its next Property Tax invoice, Alicia Kempe, Senior Vice President, Asset Management, sent Mr. Herman a letter confirming Manteca's interpretation of § 7.1 of the Lease. [Ex. 76.]

35.    Specifically, in response to an inquiry by Mr. Herman on November 12, 2014, Ms. Kempe confirmed that, "[t]he parties to the Lease clearly intended that the Tenant be responsible for its proportionate share of taxes associated with the Community Facilities District…." [Ex. 76.]

36.    Ms. Shipowitz testified that the Community Facilities District was the entire Shopping Center minus the sold off parcels. [Shipowitz TT 201:16-17; Ex. 122.]

37.    Ms. Shipowitz testified at trial that Manteca's outside counsel "worked on" Ms. Kempe's November 21, 2014 letter, confirming that the Lease "clearly intended" that AMC "be responsible for the proportionate share of taxes associated with the Community Facilities District." [Ex. 76; Shipowitz TT 402:16-17, 403:4-7.]

38.    Manteca offered no testimony at trial to explain why it adopted a position in its November 21, 2014 letter, that directly contradicts its position at trial, that AMC owes 100% of all Property Taxes billed to Parcel 41.

**C.**    **The Parties' Practice Demonstrates that the Lease Was Unambiguous.**

39.    From 2008 to 2014, first Kerasotes, and then, beginning in 2010, AMC, agreed with Manteca that the theatre's "proportionate share" of Property Taxes was based on the following calculation contained in § 7.1 of the Lease:  The multiplier consisted of the "total Property Taxes due" "for the entire tax district" (the Shopping Center, minus the sold off parcels); the numerator consisted of the 67,212 square feet that AMC occupied; and the denominator consisted of the gross leasable area of all improvements in the Shopping Center, minus the sold off parcels (approximately 392,334 square feet). [UF 25; Shipowitz TT 209:21-213:23; Exs. 23, 121, 127.]

40.    For six years from 2008 to 2014, Manteca, Kerasotes and then AMC, all agreed on

the meaning of all the definitions in § 7.1 of the Lease. [UF 25; Shipowitz TT 209:21-213:23; Exs. 23, 121.]

41.     Specifically, for six years, from 2008 to 2014, all the parties agreed that the "applicable tax parcel (the 'Tax Parcel')" in the denominator was defined as the gross leasable area of all the improvements in the entire Shopping Center (the Shopping Center, minus the sold off parcels). [UF 25; Shipowitz TT 209:21-213:23; Kempe testimony, 17:23-22:24; Exs. 23, 121.]

42.     For six years, from 2008 to 2014, all the parties agreed that the multiplier was the "total Property Taxes due" "for the entire tax district" (the Shopping Center, minus the sold off parcels). [UF 25; Shipowitz TT 209:21-213:23; Exs. 23, 76, 121.]

43.     From 2008 to 2014, Manteca's invoices to Kerasotes, and then to AMC, reflected that Kerasotes, and then AMC, paid approximately 17% of the Shopping Center's "total" "Property Taxes" "due" based on the theatre occupying approximately 17% of the gross leasable area of the improvements in the entire Shopping Center, minus the sold off parcels. [UF 25; Exs. 23, 76, 121.]

## V.     MANTECA HAD ACTUAL KNOWLEDGE THAT, SINCE 2009, AMC SAT ON A SEPARATELY ASSESSED PARCEL.

44.     On February 2, 2009, Manteca received notice from the County Assessor, advising Manteca that the County "will be splitting [AMC's leased premises] off as a separate parcel." The letter was sent to Joshua Poag, Executive Vice President and CEO of the Landlord. [UF 16; Shipowitz TT 220:12-15.]

45.     The County Assessor's February 2, 2009 notice, requested that Manteca provide the County Assessor with a "detailed drawing" of the theatre's "actual leased premises." [Ex. 16.]

46.     There is no evidence that Manteca failed to provide the "detailed drawings" of the theatre's "actual leased premises" that was requested by the County Assessor.

47.     In 2009, the County remapped the Shopping Center and changed the Shopping Center from 12 tax parcels to 26 tax parcels. As part of the remapping, the County created a separate Parcel 41 for the property on which the theatre sits. [UF 17 and 18; Shipowitz TT 255:19-21.]

48.     Ms. Shipowitz testified that in June, 2009, Manteca was notified by the County Assessor that AMC sat on a separately assessed parcel. [Shipowitz TT 220:12-15; 225:12-14.]

49.     Mr. Joshua Poag did not testify at trial.

50.     In the Summer of 2009, Kerasotes advised Ms. Alicia Kempe, Senior Vice President of Asset Management at Manteca, that Kerasotes wanted to appeal the property taxes on Parcel 41, which was the theatre parcel. [Exs. 17, 18, 19.]

51.     On July 16, 2009, Ms. Kempe advised Kerasotes that Manteca's attorney reviewed the Lease, and determined that there is no provision "in the Lease" allowing the theatre to pay taxes assessed to a separate tax parcel. Rather, the theatre was to pay its "pro rata share of the Property Taxes" due for the Shopping Center. [Ex. 19.]

52.     In October, 2012, Ms. Shipowitz recorded a boundary map of the Shopping Center showing the AMC theatre sitting on separately assessed Parcel 41. [Shipowitz TT 230:9-231:5; Exs. 30, 122.]

53.     The boundary map recorded by Ms. Shipowitz in 2012, clearly showed that AMC sat on a separately assessed parcel. [Ex. 122.]

54.     From 2009 to 2014, Manteca received tax bills from the County Assessor for all 26 tax parcels, including Parcel 41, where the theatre sat separately. [Shipowitz TT 233:21-234:1.]

55.     From 2009 to 2014, Manteca paid the Property Tax bills for Parcel 41. [Shipowitz TT 233:21-234:18.]

56.     From 2009 to 2014, Manteca added together the tax bills from all the tax parcels in the Shopping Center, including Parcel 41 for the total property taxes due.  Then Manteca billed Kerasotes, then AMC, for its approximate 17% proportionate share based on the theatre occupying approximately 17% of the gross leasable improvements in the Shopping Center. [Exs. 23, 121.]

57.     A number of Manteca employees were aware that AMC sat on a separately assessed parcel since at least 2009. [Exs. 16, 17, 18, 19, 122.]

58.     Manteca offered no viable justification for why it failed to bill AMC differently starting in 2009, when Manteca first learned that AMC was situated on a separately assessed

parcel at the Shopping Center.

## VI.   IN 2014, MANTECA CHANGED HOW IT BILLED AMC FOR PROPERTY TAXES.

59.     Although AMC sat on a separately assessed parcel from 2009 to 2014, Manteca failed to change how it billed AMC for its proportionate share of property taxes. [Exs. 23, 121; Shipowitz TT 209:21-213:23.]

60.     Manteca only changed how it billed AMC for Property Taxes in 2014, when Manteca received its first bill for CFD assessments in the amount of $346,625. [Shipowitz TT 218:18-219:1.]

61.     On June 23, 2014, after the theatre had been sitting on a separately assessed parcel for five years, Manteca sent AMC a letter advising that, because AMC sat on a separately assessed parcel, Manteca would hereinafter be billing AMC for all "Property Taxes," including all CFD assessments that Manteca unilaterally assigned to Parcel 41. [Exs. 38, 68, 69-2, 93, 94; UF 26.]

62.     Manteca failed to advise AMC in its June 23, 2014 letter, which provision of the Lease purportedly allowed Manteca to bill AMC for all Property Taxes assigned to a separately assessed tax parcel where AMC was situated. [Ex. 38.]

63.     Ms. Shipowitz testified that she and Ms. Kempe were the individuals who decided in 2014 to "chang[e] direction" regarding how Manteca billed AMC for Property Taxes. [Shipowitz TT 253:8-24; Ex. 46.]

64.     Neither Ms. Shipowitz nor Ms. Kempe is a lawyer. [Shipowitz TT 205:18-23; 255:7-9.]

65.     Manteca's General Counsel, Robert Rogers, was purportedly not consulted regarding whether the Lease allowed Manteca to bill AMC for all Property Taxes assigned to a separately assessed tax parcel where AMC was situated. [Shipowitz TT 253:8-24.]

66.     Attorney Schram testified that in approximately 2014, he received a call from Manteca asking him the definition of Tax Parcel in connection with the AMC Lease. [Schram testimony, 19:10-16.]

1     67.    Attorney Schram testified that "Tax Parcel" was the entire Shopping Center, minus

2 the sold off parcels. [Schram testimony, 47:22-48:22.]

3     68.    Any advice given by Attorney Schram to Manteca was ignored by Manteca.

4     69.    Ms. Kempe, Manteca's Senior Vice President of Asset Management, testified that

5 even if AMC sat on a separately assessed parcel, Manteca could not bill AMC for all Property

6 Taxes assigned to that parcel, unless the Lease permitted Manteca to do so. [Kempe testimony,

7 66:14-22.]

8     70.    Ms. Shipowitz testified that there is no provision in the Lease allowing Manteca to

9 bill AMC for reimbursement of all Property Taxes assigned to a separately assessed parcel where

10 AMC is situated.  That is merely Ms. Shipowitz's "interpretation." [Shipowitz TT 262:15-263:9.]

11    71.    Ms. Kempe testified that it was her "interpretation" that the mere use of the phrase

12 "applicable tax parcel," meant that if the theatre sat on its own separately assessed parcel, then the

13 theatre would be required to pay all taxes assessed to that parcel. [Kempe testimony, 22:4-21.]

**VII.    BEGINNING IN JUNE 2014, MANTECA FAILED TO PROVIDE AMC WITH "A DETAILED INVOICE" DISCLOSING HOW IT CALCULATED AMC'S "PROPORTIONATE SHARE" OF PROPERTY TAXES.**

16    72.    Section 7.1 of the Lease requires Manteca to provide AMC with a "detailed

17 invoice" showing how Manteca calculated AMC's "proportionate share" of Property Taxes.

18 [Ex. 1-14.]

19    73.    From 2010 to 2014, Manteca had always provided AMC with a "detailed invoice"

20 of how it calculated AMC's proportionate share of property taxes, including providing to AMC

21 the amount of the multiplier, numerator, and denominator as required by § 7.1 of the Lease. [Exs.

22 23, 121.]

23    74.    Beginning in 2014, Manteca stopped providing a "detailed invoice" including how

24 it calculated AMC's proportionate share of property taxes, including providing to AMC the

25 amount of the multiplier, numerator, and denominator as required by § 7.1 of the Lease.

26 [Shipowitz TT 265:4-266:23; 408:13-24.]

27    75.    Starting with the June 23, 2014 invoice, and continuing to the present, Manteca

28 has breached the Lease by failing to provide AMC with any "detailed invoices" of how it

1   calculated AMC's proportionate share of Property Taxes as required by § 7.1 of the Lease.

2   **VIII.   MANTECA UNILATERALLY DETERMINED WHICH TAX PARCELS IN THE
         SHOPPING CENTER WOULD BE BURDENED WITH THE CFD**
3        **ASSESSMENTS.**

4        76.     A community facilities district was created for the Shopping Center in May 2013

5   to raise money for infrastructure at the Shopping Center. [UF 21.]

6        77.     The CFD improvements were intended to benefit the entire Shopping Center. [UF

7   22.]

8        78.     For the first year of the CFD assessment in 2014, the total assessment was

9   $346,625, which was subject to a 2% annual increase. [Shipowitz TT 211:6-17; Ex. 46.]

10       79.     The landowner, Manteca, is responsible for paying 100% of the Property Taxes for

11  the Shopping Center, which included the CFD assessments. [Shipowitz TT 202:22-203:13; Ex.

12  120-4.]

13       80.     Manteca could only bill tenants in the Shopping Center for reimbursement of

14  Property Taxes (including the CFD assessments) in accordance with the terms of each tenant's

15  lease. [Shipowitz TT 202:22-203:13; Exs. 1, 120-4, Kempe testimony, 60:23-61:07; 61:21-24;

16  66:14-18.]

17       81.     In 2014, Manteca was required to designate a certain amount of square footage at

18  the Shopping Center that, when multiplied by an amount not to exceed $3.70 per square foot,

19  equaled at least $346,625. [UF 24.]

20       82.     The landowner, Manteca, unilaterally decided which tax parcels in the Shopping

21  Center would be burdened with 100% of the CFD assessments. [Shipowitz TT 237:10-14; Exs.

22  68, 69-2, 120-5.]

23       83.     Ms. Shipowitz and Ms. Kempe were the individuals at Manteca who decided

24  which tax Parcels would be burdened with 100% of the CFD assessments. [Shipowitz TT 253:8-

25  24.]

26       84.     On March 27, 2013, the landowner, Manteca, sent a tax commencement letter to

27  the County Assessor identifying which tax parcels in the Shopping Center that Manteca had

28  selected to be burdened by 100% of the CFD assessments. [Exs. 93, 94.]

85.     Manteca assigned just four of the 28 tax parcels in the Shopping Center to be burdened with the CFD assessments. [Shipowitz TT 249:15-19; Exs. 68, 69, 93, 94.]

86.     The four tax parcels Manteca assigned to be burdened with 100% of the CFD assessments were parcels 11, 29, 40, and 41. [Shipowitz TT 249:4-8; Exs. 68 and 69.]

87.     Since June 2009, the theatre had sat on Parcel 41 of the Shopping Center. [Shipowitz TT 230:9-231:5; Exs. 30, 122.]

## IX.    MANTECA BILLS AMC FOR PROPERTY TAX REIMBURSEMENT USING A FORMULA NOT CONTAINED IN THE LEASE

88.     On June 18, 2014, Ms. Kempe decided that Manteca was "changing direction," and that AMC would, in the future, be billed for "their own parcel versus their pro rata share." [Ex. 46.]

89.     At some point after June 18, 2014, Manteca realized that it could not unilaterally "chang[e] direction," and was required, under § 7.1 of the Lease, to bill AMC for its proportionate share of Property Taxes.

90.     Manteca was then forced to re-write the formula for AMC's proportionate share of Property Taxes in an effort to justify AMC paying two-thirds of the total CFD assessments for the entire Shopping Center, as well as 100% of all real property taxes for Parcel 41. [Shipowitz TT 249:25-250:17; Exs. 68, 69.]

91.     Sometime after June 18, 2014, Manteca created a new definition for the denominator in § 7.1. Manteca changed the definition of the denominator from the gross leasable square feet of all improvements in the Shopping Center, minus the sold off parcels, to the gross leasable area in Parcel 41, where the theatre was situated. [Shipowitz TT 252:4-254:11.]

92.     Manteca manipulated the denominator in § 7.1 of the Lease, so that the numerator and denominator would each be the square footage of the AMC theatre, so that it could claim that AMC would be responsible to reimburse Manteca for 100% of whatever amount Manteca put in the multiplier.

93.     Manteca was then forced to change the definition in the multiplier.

94.     Manteca could not use the "total" CFD assessments for "the entire tax district" in

the multiplier, because such amount would exceed the maximum amount that Manteca could assign to Parcel 41 for CFD assessments. [Shipowitz TT 238:2-239:7, 246:23-247:5.]

95.     Specifically, Manteca could only bill AMC's 67,212 square foot parcel an amount not to exceed $3.70 per square foot, for a total of $248,684.

96.     Therefore, Manteca was forced to re-write the definition of the multiplier in § 7.1, to be two-thirds of the total CFD assessments for the entire Shopping Center, as well as 100% of all real property taxes for Parcel 41.

97.     Manteca created the new definition of the multiplier based on the following: Manteca unilaterally identified 100,319 square feet to be burdened by the CFD assessments, and because AMC was 67,212 of such square footage, the multiplier became two-thirds of the total CFD assessments for the entire Shopping Center, as well as 100% of all real property taxes for Parcel 41. [Exs. 68, 69.]

98.     There is no provision in the Lease, allowing Manteca to unilaterally change the terms of the Lease. [See generally, Ex. 1.]

99.     Robert L. Rogers, Manteca's Chief Operating Officer and General Counsel, exerted pressure on AMC to pay a disproportionate share of the Property Taxes for the Shopping Center by threatening to charge interest and to "turn this matter over to local counsel to avail itself of all remedies available under the terms of the Lease together with any and all other remedies available at law or equity," including eviction. [Ex. 41-1.]

100.     Ms. Shipowitz, on behalf of Manteca, communicated to Sarah Bollinger at AMC that "[i]n the future [AMC] will need to pay reconciliations when billed and [AMC] may reserve [its] rights to object to something in the future." [Ex. 37-3.]

101.     Accordingly, AMC made all payments for Property Taxes under protest to avoid, among other threatened penalties, eviction. [Herman TT 71:4-72:2; Exs. 41, 99.]

102.     After mediating the dispute at issue in this case, AMC promptly filed its Complaint. [Herman TT 91:8-22.]

**X.     THE UNSIGNED, NONBINDING, 2007 LETTER OF INTENT**

103.     Manteca provided Kerasotes with an unsigned letter of intent ("LOI") dated June

27, 2007. [Ex. B.]

104.   The unsigned LOI was prepared at least five months prior to the parties executing the Lease, and there is no evidence in the record regarding which terms of the nonbinding LOI, if any, that the parties intended to incorporate into the Lease.

105.   There is no evidence that anyone from AMC ever saw the LOI prior to assuming the Lease.

106.   Ms. Shipowitz and Mr. DiGeronimo both testified that the unsigned LOI was not binding. [Shipowitz TT 274:14-22; DiGeronimo TT 328:1-11; 342:17-18.]

107.   There is no evidence in the record identifying the drafter of the LOI.

108.   The unknown drafter of the LOI, who created the $5 per square foot estimate of CFD assessments and Property Taxes, was not deposed nor called as a witness at trial.

109.   The $5 estimate per square foot of Property Taxes does not state how much of such estimate was attributed to CFD assessments, and how much was attributed to ad valorem real estate taxes. [Ex. B.]

110.   There is no evidence in the record regarding the factors that the unknown drafter of the LOI used to calculate the $5 per square foot estimate of ad valorem property taxes and CFD assessments.

111.   The $5 estimate of property taxes was created in 2007 and was likely based on certain assumptions made by the unknown drafter of the LOI. [Herman TT 123:1-125:3; Shipowitz TT 275:11-276:5.]

112.   The $5 estimate made by the unknown drafter of the LOI was likely based on the assumption that 512,940 square feet of improvements would be built at the Shopping Center, and that $25 million in bonds would be issued. [Herman TT 123:1-125:3; Shipowitz TT 275:11-276:5.]

113.   However, only 392,334 square feet of improvements were ultimately built at the Shopping Center [Ex. 69], and only $6,245,000 of CFD bonds were ultimately issued. [Ex. 120.]

114.   In addition, the Property Taxes were re-assessed in 2012/2013, 2013/2014, and 2014/2015, lowering the amount of property taxes that Manteca paid for the Shopping Center.

115.     The $5 estimate per square foot for total Property Taxes actually supports AMC's position that AMC must pay its proportionate share of Property Taxes based on the percentage of the Shopping Center that AMC occupies.

116.     If one used the assumptions that existed in 2007, AMC would have been charged 13% of the total Property Taxes (67,212 sq. ft. of 512,940 sq. ft.). [Ex. 69, 74, 120; AMC demonstrative 130.]

117.     If one used the assumptions that existed in 2007, 13% of the Shopping Center's total ad valorem real estate taxes for 2014 would equal approximately $2.37 per square foot.

118.     If one used the assumptions that existed in 2007, 13% of the Shopping Center's total CFD assessments for 2014 would equal approximately $2.70 per square foot.

119.     Accordingly, the evidence indicates that the unknown drafter of the LOI likely intended that the theatre pay total Property Taxes equaling its 13% proportionate share of the total Property Taxes due for the entire Shopping Center, or $5.07 per square foot.

XI.     **THE PJ SOLOMON REPORT**

120.     The PJ Solomon report was created at least four years prior to the Tax Assessor levying any CFD assessments against the Shopping Center and was likely based on the same inaccurate assumptions found in the LOI that failed to materialize. [Ex. Z-95.]

121.     There is no evidence in the record explaining PJ Solomon's role, if any, in AMC's acquisition of the Kerasotes theatre at the Shopping Center. [Gallivan testimony, 35:6-36:23.]

122.     There is no evidence regarding which party to the theatre transaction, if any, hired PJ Solomon.

123.     There is no evidence regarding what data or assumptions, if any, PJ Solomon used to create its report.

124.     The PJ Solomon report only provides estimates for projected Property Taxes through 2013. The CFD assessments did not commence until 2014. [Ex. Z-95.]

125.     The PJ Solomon report only provides a $5 per square foot estimate for just ad valorem real property taxes for the years 2008-2013.  There is no per square foot estimate of CFD assessments anywhere in the PJ Solomon report. [Ex. Z-95.]

126.    There is no evidence from any representative from PJ Solomon regarding how its report, or any estimates contained in the report, were created for the theatre.

127.    No one from PJ Solomon was deposed, or called as a witness at trial, to explain how it created the estimate for the Property Taxes for the theatre.

## XII.    THE LEASE ABSTRACT

128.    The Lease Abstract was created during the negotiation of the Lease. [Shipowitz TT 310:23-311:20.]

129.    The Lease Abstract was created at least six years prior to the Tax Assessor levying any CFD assessments against the Shopping Center and was likely based on the same inaccurate assumptions found in the LOI that failed to materialize.

130.    The Lease Abstract was predicated on the theatre occupying 70,000 square feet, rather than the 67,212 square feet that it ultimately occupied. [Ex. I.]

131.    There is no evidence in the record identifying the individual who prepared the Lease Abstract. [Ex. I.]

132.    There is no evidence in the record whether or not the Lease Abstract includes CFD assessments. [Ex. I.]

## XIII.    AMC FILED A TAX APPEAL FOR PARCEL 41 GIVEN ITS DIRECT ECONOMIC INTEREST IN THE VALUE OF THE PREMISES.

133.    Mr. Herman testified that, as a matter of course, AMC appeals property taxes for its theatres to ensure that AMC has less of a tax burden. [Herman TT 92:10-17.]

134.    Mr. Herman testified that, even if AMC is paying a proportionate share of property taxes for an entire shopping center, it nevertheless appeals property taxes on parcels where its theatre sits to reduce its proportionate share of the property taxes. [Herman TT 92:10-23.]

135.    Mr. Herman testified that AMC withdrew its tax appeal for Parcel 41 because Manteca has already filed an appeal. [Herman TT 93:11-16.]

## CONCLUSIONS OF LAW

## I.    LEGAL STANDARD

136.    Federal Rule of Civil Procedure ("Rule") 52(a)(1) states that "[i]n an action tried

on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58."

137.    The Court must view all questions of fact and law at issue before it.  The Court granted summary judgment for Defendant on the claim of constructive trust and unjust enrichment, but denied summary judgment as to all other claims.  [Dkt. No. 69.]  The Ninth Circuit has held that denial of summary judgment does not bind the Court in any way to consider facts or law presented at trial.  *Fred Segal, LLC v. CormackHill, LP*, 821 F. App'x 783, 786 (9th Cir. 2020); *Burbank v. City of Idaho Falls*, 98 F.3d 1345 (9th Cir. 1996).  Put simply, "denial of a summary judgment motion is never law of the case."  *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014).  The Court is thus not bound to the arguments or facts presented before it at the summary judgment stage, and will consider the claims and evidence put before it at trial.  As such, this Court considers the following causes of action: (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing; and (3) declaratory relief.

## II.    BREACH OF CONTRACT

### A.    General Contract Principles

138.    To prevail on its claim for breach of contract under California law, AMC must prove: (1) the existence of a contract; (2) AMC's performance of the contract; (3) Manteca's breach of the contract; and (4) damage incurred to AMC.  *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1387 (2010); *L'Garde, Inc. v. Raytheon Space and Airborne Systems*, 805 F. Supp. 2d 932, 941 (C.D. Cal. 2011); *see also Medico-Dental Bldg. Co. of Los Angeles v. Horton & Converse*, 21 Cal. 2d 411, 418–19 (1942) (applying contract analysis to context of commercial leases).  The existence of the Lease, and AMC's performance, is undisputed by the parties, as well as the fact that AMC has paid higher reimbursements for its purported tax burden based on Manteca's interpretation of the Lease.  (UF 3, 13, 25-29.)  All that remains to be determined by this Court is whether Manteca is in breach of the Lease, and the damages caused by the breach.

139.    Under California law, the rule is to give effect to contracts as written, as to do

otherwise would impermissibly allow parties to renege on negotiated agreements and undermine the entire purpose of entering into contracts.  *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation . . . .").

140.    A lawsuit is not an opportunity to renegotiate a contract, and it is a foundational principle that the parties be held to the "very meaning of the words used" in a written agreement. *See Porto Rico Sugar Co. v. Lorenzo*, 222 U.S. 481, 482 (1912).  Additionally, the language of a contract is not made ambiguous merely because "the parties urge different interpretations."  *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1044 (9th Cir. 2020) (internal quotes omitted).

141.    As such, the plain language of the Lease is to be strictly enforced to give effect to the intent of the parties as manifested at the time of contracting.  *See Amtower v. Photon Dynamics, Inc.*, 158 Cal. App. 4th 1582, 1605 (2008) ("[T]he overriding goal of interpretation is to give effect to the parties' mutual intentions as of the time of contracting.") (internal quotes omitted).  It is a basic tenant of California law that once an agreement is reduced to writing by the parties, the written agreement forms the final expression of said agreement.  Cal. Civ. Proc. Code § 1856(a).  Such a plain-language reading is limited to the extent that doing so does not lead to an absurdity.  *See* Cal. Civ. Code § 1643 ("A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.").

142.    This Circuit has recognized that under California law, the mutual intention of the parties is determined "'from the written terms [of the contract] alone,' so long as the 'contract language is clear and explicit and does not lead to absurd results.'"  *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020) (quoting *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 831 (2007), *as modified* (Nov. 28, 2007)); *see also Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 616 (9th Cir. 2020) (quoting Cal. Civ. Code § 1644 (recognizing that under California law, "words of a contract are to be understood in their ordinary and popular sense")).  Additionally, interpretation of a contract must be based on the whole of a contract, so as to give effect to every part, if reasonably practicable, each clause helping to

interpret the other."  Cal. Civ. Code § 1641.  "We seek to interpret the contract in a manner that makes the contract internally consistent."  *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1979); *see also Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 789 (9th Cir. 2008).

**B.   <u>AMC Is Required To Pay Its Proportionate Share of the Total Property Taxes Due for the Entire Shopping Center.</u>**

143.    Beginning in 2014, Manteca breached the Lease by: (1) re-defining the multiplier as two-thirds of the total CFD assessments for the entire Shopping Center, as well as 100% of all real property taxes for Parcel 41; (2) re-defining the fraction so that the numerator and the denominator are identical so that AMC is required to pay 100% of whatever number Manteca used as the multiplier; and (3) camouflaging its calculations by not providing AMC with a "detailed invoice."  [Ex. 1; Shipowitz TT 265:4-266:23; 408:13-24.]

144.    The Lease contains a precise calculation to determine the theatre's "proportionate share" of the Property Taxes, including CFD assessments, which is clearly set forth in § 7.1:

> "Property Taxes" shall include any special assessment resulting, in whole or in part, from capital improvements for the entire tax district, including Community Facilities District, of which the Shopping Center is a part and which benefit the Shopping Center. Tenant's proportionate share of Property Taxes shall equal the product of the total Property Taxes due with respect to the land and improvements included in the applicable tax parcel (the "Tax Parcel") multiplied by a fraction, the numerator of which shall be the GLA of the Leased Premises and the denominator of which shall be the GLA of all improvements included in the Tax Parcel. (§ 7.1.)

145.    The calculation in § 7.1 contains a multiplier, a numerator, and a denominator, to determine the tenant's proportionate share of that total.  The multiplier is the total Property Taxes due for the entire tax district, which is the Shopping Center, less separately owned parcels.  The numerator is the Leased Premises of AMC.  The denominator is the total gross leasable area of all improvements included in the Tax Parcel.  Attorney Schram testified that the Tax Parcel is the entire Shopping Center, less the separately owned parcels.  The parties interpreted the Tax Parcel as the entire Shopping Center, less the separately owned parcels, from 2008 until, at least, November 21, 2014. [Ex. 76.]

**C.**      **All Parties Had The Same Interpretation Of The Lease From 2008 To 2014.**

146.   "The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions." *Kennecott Corp. v. Union Oil Co. of Cal.*, 196 Cal. App. 3d 1179, 1189 (1987); *see also Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 946 (N.D. Cal. 2009) (same).  Not only did Manteca, Kerasotes, and then AMC, adopt this interpretation of § 7.1 for more than six years, but Manteca also billed AMC in accordance with this interpretation.

147.   At the time of contracting, Parcel 41 was not separately assessed, and the applicable tax parcel was the entire Shopping Center minus the sold off parcels.

148.   It is undisputed that, from 2008 until 2014, the multiplier was interpreted by the parties as the total Property Taxes due for the entire Shopping Center, less the separately owned parcels.

149.   It is undisputed that, from 2008 to 2014, Manteca used the square footage of "all improvements" in the Shopping Center, less separately owned parcels, as the denominator to calculate the theatre's "proportionate share" of the taxes.  Specifically, Manteca billed Kerasotes, and then AMC, for 17% of the Shopping Center's taxes based on the theatre occupying 17% of the improvements of the entire Shopping Center, less separately owned parcels.

150.   Based on the parties' interpretation of § 7.1, Kerasotes, and then AMC, reimbursed Manteca for approximately 17% of the Property Taxes for the Shopping Center, based on the theatre occupying approximately 17% of the Shopping Center.

151.   Manteca did not re-interpret the Lease in 2009 when it was notified that the theatre sat on a separately assessed parcel.  It was not until 2014, when Manteca became obligated to pay the $346,625 in CFD special assessments, that Manteca unilaterally changed its interpretation of the Lease, and demanded that AMC reimburse Manteca for all Property Taxes billed to Parcel 41, which included 67% of the CFD assessments.

**D.**      **Manteca Changes Its Interpretation Of The Lease.**

152.   In 2013/2014, Manteca received its first CFD assessment for the Shopping Center. The total CFD assessment due for the entire Shopping Center for the first year was $346,625.

Manteca could not assign 100% of the CFD assessment to just Parcel 41 because pursuant to the Maximum Rate Threshold, Manteca could only assign a maximum of $3.70 per square foot to Parcel 41, which totaled $248,684 (67,212 x 3.70).  [UF 24.]

153.    In 2014, Manteca manipulated the definition of the multiplier to be two-thirds of the total CFD assessments for the entire Shopping Center, as well as 100% of all real property taxes for Parcel 41.  Manteca then manipulated the definition of the denominator to be the same as the numerator, so that AMC would have to pay 100% of the amount Manteca assigned as the multiplier.

154.    Manteca failed to adequately explain how its seemingly arbitrary decision to bill AMC for two-thirds of the CFD assessments is supported by the Lease.

155.    If Manteca did not create this new interpretation of § 7.1, Manteca would only be able to seek reimbursement of 17% of the CFD assessment from AMC, requiring Manteca to come out of pocket to pay the remaining CFD assessment (which was $173,312.50 for the 2013/14 tax year).

156.    Despite having received notice in 2009 from the County Assessor that the theatre sat on a separately assessed parcel, Manteca waited until it received its first bill for CFD assessments to change how it billed the theatre for Property Taxes.  The Court is not persuaded that this was a mistake on Manteca's part, as there is considerable evidence that Manteca knew or should have known Parcel 41 was separately assessed as early as 2009.

157.    Despite Defendant's contention that it interpreted the Lease to require that the definition of "applicable tax parcel" would change if a parcel became separately assessed, the relevant portion of the Lease does not include this language, nor does it even include the term "separately assessed."

158.    Although Defendant argues the parties did or should have contemplated that Parcel 41 would eventually become separately assessed, the Lease is silent on that issue.

/ / /

/ / /

/ / /

**E.      Parol Evidence Is Inadmissible.**

        i.      Parol Evidence Is Inadmissible To Interpret the Terms of an Unambiguous Contract.

159.     There is no basis for this Court to admit or consider Manteca's parol evidence for the purpose of interpreting an unambiguous Lease.  "Extrinsic evidence may be admitted to explain the meaning of an ambiguous contract, but cannot be admitted to show the parties' intention independent of an unambiguous written instrument."  *W. Heritage Ins. Co. v. Frances Todd, Inc.*, 33 Cal. App. 5th 976, 991 (2019).  Regardless of any communications between the parties prior to the signing of the Lease, the Lease itself forms the final expression of what the parties agreed to.  Cal. Civ. Proc. Code § 1856(a).  This was specifically memorialized in the Lease, as § 22.3 of the Lease contains a broad integration clause which bars, *inter alia*, any oral or written understandings between the parties, other than as set forth in the Lease.  *See Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 277 (9th Cir. 1992); *James G. Freeman & Assocs., Inc. v. Tanner*, 56 Cal. App. 3d 1, 9 (1976) (parol evidence used to prove elements not reduced to writing may only be admitted where "parties have not intended the writing to be a complete and final embodiment of their agreement").

        ii.      Alternatively, Parol Evidence Cannot Contradict the Terms of an Agreement.

160.     Manteca offers (1) a non-binding and unsigned letter of intent (Exs. B, C), (2) a lease abstract prepared by Manteca (Ex. I), and (3) the PJ Solomon report (Ex. Z), for the proposition that AMC's tax burden should be roughly $5 per square foot.  None of these documents address the effect, if any, should Parcel 41 become a separately assessed tax parcel.  It is unknown who prepared these documents and how the estimates were created.  It is undisputed that the estimates were based on assumptions that never materialized.  [Herman TT 123:1-125:3; Shipowitz TT 275:11-276:5.]

161.     The estimates constitute inadmissible parol evidence that is being offered by Manteca to contradict the formula in § 7.1 for calculating the theatre's pro rata share of Property Taxes.

162.     Manteca attempts to "back into" a new calculation to determine AMC's proportionate share of Property Taxes.  Manteca claims that because certain unknown individuals in 2007 contemplated that the theatre could be paying approximately $5 per square foot in total Property Taxes, that the Lease should be re-written years later to achieve this estimation.

163.     The Lease itself does not expressly include or reference the $5 estimate.  Manteca contends the letter of intent's $5 estimate only makes sense if Parcel 41 became separately assessed, but Manteca fails to adequately explain or support this assertion.

164.     Manteca cannot rely on a $5 estimate of property taxes, created by unknown individuals, based on assumptions that never materialized, to contradict the plain language of the Lease.  It is a basic construction of California law that this Court cannot rely on parol evidence that would contradict the express terms of the contract.  *Enrico Farms, Inc. v. H. J. Heinz Co.*, 629 F.2d 1304, 1306 (9th Cir. 1980); *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 40 (1968); *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050, 1061 (2010).  Manteca's reliance on the $5 per square foot estimate in the unsigned letter of intent would flatly contradict the language of the Lease.  Manteca cannot use parol evidence where it would lead to a completely different calculation of AMC's Property Tax reimbursements than those resulting from the plain language of the Lease.

## F.   Alternatively, Manteca's Interpretation of § 7.1 Would Lead To Absurd Results.

165.     Manteca's interpretation would make the contract absurd, unusual, unjust and inequitable, in contravention of California law.  *See Hertzka & Knowles v. Salter*, 6 Cal. App. 3d 325, 335 (1970) (court should avoid interpretation that makes contract unusual, extraordinary, harsh, unjust, or inequitable, or that would result in absurdity); *Flagship West, LLC v. Excel Realty Partners, L.P.*, 758 F. Supp. 2d 1004, 1012–1013 (E.D. Cal. 2010).  Contract language cannot be read so as to produce "absurd results."  *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003), *as modified on denial of reh'g* (Sept. 17, 2003).

166.     Manteca's interpretation is absurd, unusual, unjust, and inequitable for the following reasons.  First, the improvements to the Shopping Center financed by the issuance of

the CFD bonds benefit the entire Shopping Center.  It is unjust, unreasonable, and absurd for one tenant to pay two thirds of the total CFD assessments for the entire Shopping Center when it only occupies 17% of the center.  Second, requiring AMC to pay two thirds of the CFD assessments is particularly unjust and inequitable because Manteca unilaterally assigned the CFD assessments to Parcel 4.  Third, the timing of when Manteca suddenly changed its billing practices is particularly suspect, as Manteca waited to change how it billed AMC until after it received its first bill for CFD assessments.  Lastly, it is an absurdity for AMC to pay two thirds of the CFD assessments when its Lease provides that it only be responsible for its "proportionate share" of such assessments.

167.   Defendant fails to persuade the Court that the equitable estoppel doctrine bars Plaintiff's claim.   A party asserting an equitable estoppel claim must prove four elements: (1) the party to be estopped must have been apprised of the facts; (2) the party to be estopped must have intended for its conduct to be acted on, or must have acted so the party asserting estoppel had a right to believe it was so intended; (3) the party asserting estoppel must have been ignorant of the true facts; and (4) the party asserting estoppel must have relied on the conduct to its injury.  *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 489 (1970); *County of Sonoma v. Rex*, 231 Cal. App. 3d 1289, 1297 (1991).  Defendant fails to adequately develop this argument and fails to cite sufficient evidence or authority to convince the Court that it was reasonable for Defendant to believe Plaintiff's conduct as to real estate taxes meant that Plaintiff accepted Defendant's interpretation of the Lease as it related to CFD assessments.

## III.   BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

168.   "California law implies in every contract a covenant of good faith and fair dealing, unless the contract expressly states otherwise."  *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342 (1992).  The covenant of good faith and fair dealing aims to effectuate the contract's purposes and promises, and to protect the parties' legitimate expectations based upon the terms of the contract.  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988).  The covenant requires each party to do all things reasonably contemplated by the contract's terms to accomplish its goals, and to refrain from doing anything that would destroy or injure another

party's right to receive the fruits of the contract.  *Kendall v. Ernest Pestana, Inc.*, 40 Cal. 3d 488 (1985); *Ocean Servs. Corp. v. Ventura Port Dist.*, 15 Cal. App. 4th 1762 (1993).  Thus, when a contract confers on one party a discretionary power affecting the rights of another, the party with the discretionary power must exercise it in good faith and in accordance with fair dealing.  *Kelly v. Skytel Commc'ns, Inc.*, 32 F. App'x 283, 285 (9th Cir. 2002).

169.    Such a breach occurs when a party's "conduct is objectively unreasonable." *Carma Developers (Cal.), Inc. v. Marathon Develop. Cal., Inc.*, 2 Cal. 4th 342, 372 (1992).

170.    The covenant of good faith and fair dealing requires that Manteca not "do anything that will injure the right of [AMC] to receive the benefits of the contract."  *Habitat Trust Wildlife Inc. v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1332 (2009); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 353 (2000).

171.    In the instant case, the parties' Lease expressly incorporates this requirement of good faith and fair dealing:  § 22.19 of the Lease requires that "[t]he parties agree to act in good faith and with fair dealing with one another in the execution, performance and implementation of the terms and provisions of this Lease."  (UF 8.)

172.    Manteca breached the covenant of good faith and fair dealing by:  (1) unilaterally assigning two thirds of the CFD assessment to Parcel 41 and then billing AMC for 100% of such assessment, thereby making AMC pay two thirds of the CFD assessment when it only occupied 17% of the Shopping Center minus sold off properties; and (2) failing to provide AMC with a detailed invoice of how Manteca calculated AMC's pro rata share of the CFD assessment.

## IV.    DAMAGES

173.    Defendant argues Plaintiff's damages should be reduced based on the voluntary payment doctrine.  More specifically, Defendant argues Plaintiff cannot recover any alleged overpayments made before the Complaint was filed on May 19, 2016.  (ECF No. 127 at 35.)

174.    "Payments of illegal claims enforced by duress, coercion or compulsion, when the payor has no other adequate remedy to avoid it, will be deemed to have been made involuntarily and may be recovered, but the payment must have been enforced by coercion and there must have been no other adequate means available to prevent the loss."  *W. Gulf Oil Co. v. Title Ins. & Tr.*

*Co.*, 92 Cal. App. 2d 257, 264 (1949).  "[T]he general rule with regard to duress of this character is that where, by reason of the peculiar facts a reasonably prudent man finds that in order to preserve his property or protect his business interests it is necessary to make a payment of money." *Id.* at 265.  "Whether the plaintiff . . . acted as a reasonably prudent person, depends upon the facts and circumstances and is a question for the trial court's determination." *Id.*

175.     The Court agrees with Defendant that Plaintiff's payments prior to bringing this action were voluntary.  Importantly, Plaintiff does not cite authority — nor does it distinguish Defendant's authority — in its trial brief or subsequent filings to challenge the applicability of the voluntary payment doctrine in this case.  Rather, Plaintiff summarily argues that it "made all payments for Property Taxes under protest to avoid, among other threatened penalties, eviction." (ECF No. 126 at 14.)  Based on the record before the Court, the Court concludes that paying "under protest" after receiving a single notice of default, without more, is insufficient to show that Plaintiff's payments were due to economic duress or coercion.  *See Steinman v. Malamed*, 185 Cal. App. 4th 1550, 1558 ("Even if the payment had been truly 'under protest,' that would not necessarily make the payment involuntary, as more is required.").  Further, Plaintiff fails to show there was "no other adequate remedy" to prevent the loss during the considerable length of time between when Plaintiff started making payments under protest in November 2014 to when it finally filed the instant action in May 2016.  *See W. Gulf Oil Co.*, 92 Cal. App. 2d at 264–65 ("Plaintiff could have commenced action immediately. . . Instead, plaintiff chose to pay the disputed amount, thus removing the grounds for possible forfeiture of the lease, and delayed commencement of the action some 208 days . . . [and] there was evidence from which the trial court could infer that the payments were made to avoid litigation until such time as plaintiff elected to commence action.").

176.     In addition, for a finding of economic duress, "the party insisting on payment must act wrongfully, with the knowledge that the claim asserted is false."  *Steinman*, 185 Cal. App. 4th at 1559.  In the instant case, while the evidence shows the parties "differed in their calculation of the amount due," the Court concludes that "[Defendant's] request for payment was not 'wrongful' or knowingly false." *Id.*  Rather, "[t]he record shows, instead, a 'legitimate dispute' over an

1  'uncertain amount owed.'"  *Id.*  Absent evidence showing that Defendant's "request for payment

2  was knowingly wrongful, there [is] not substantial evidence of economic duress."  *Id.* at 1560.

3      177.    For these reasons, the Court concludes the voluntary payment doctrine bars

4  Plaintiff from recovering pre-lawsuit payments, which the Court finds were voluntarily made.  As

5  such, Plaintiff's proposed damages calculation (ECF No. 126 at 26–27) requires adjustment, and

6  the Court will order further briefing on the issue.

7  **V.    DECLARATORY RELIEF**

8      178.    The Court is authorized to "declare the rights and other legal relations of any

9  interested party seeking such declaration."  28 U.S.C. § 2201(a).  AMC has demonstrated that

10  Manteca's charging a disproportionate share of the CFD assessments to AMC is a breach of the

11  Lease.  The initial term of the Lease continues for approximately ten more years.  In addition,

12  there are four 5-year options providing the potential for an additional twenty years. (Ex. 1 at ¶¶

13  2.1, 2.2.)

14      179.    Therefore, it is in the interest of both the parties and judicial economy to declare

15  the appropriate interpretation of the Lease with respect to AMC's reimbursement of future

16  Property Taxes, which includes CFD assessments, throughout the duration of the Lease.  *See*

17  *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1107 (9th Cir. 2011).  As such, AMC's proportionate

18  share of Property Taxes shall equal the product of the total Property Taxes due with respect to the

19  entire Shopping Center, minus separately owned parcels (the Tax District), multiplied by a

20  fraction, the numerator of which will be the gross leasable area of AMC's leased premises, and

21  the denominator of which shall be the gross leasable area of all improvements in the Shopping

22  Center, minus the separately owned parcels.

23  **VI.    ATTORNEYS' FEES**

24      180.    Plaintiff shall file a motion for attorneys' fees and costs pursuant to § 22.4 of the

25  Lease. [Ex. 1-36.]

26  **VII.    CONCLUSION**

27      181.    Judgment will be entered in Plaintiff's favor consistent with this ruling after the

28  Court rules on the issue of damages.  The Court ORDERS Plaintiff to file an updated damages

request consistent with this ruling not later than fourteen (14) days of the electronic filing date of this Order.  Defendant may file a response not later than seven (7) days after Plaintiff files its updated damages request.  Plaintiff may file a reply not later than three (3) days after Defendant files its response.  The parties' filings shall not exceed five (5) pages in length.

IT IS SO ORDERED.

**DATE:  June 1, 2023**

Troy L. Nunley
United States District Judge