MANATT, PHELPS & PHILLIPS, LLP
ROBERT H. PLATT (Bar No. CA 108533)
E-mail: rplatt@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone:   (310) 312-4000
Facsimile:   (310) 312-4224

MANATT, PHELPS & PHILLIPS, LLP
CHRISTIAN E. BAKER (Bar No. CA 247006)
E-mail: cbaker@manatt.com
THOMAS R. WORGER (Bar No. CA 311312)
E-mail: tworger@manatt.com
One Embarcadero Center, 30th Floor
San Francisco, CA 94111
Telephone:   (415) 291-7400
Facsimile:   (415) 291-7474

Attorneys for Plaintiff
AMERICAN MULTI-CINEMA, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| AMERICAN MULTI-CINEMA, INC., a Missouri corporation,<br><br>Plaintiff,<br><br>v.<br><br>MANTECA LIFESTYLE CENTER, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No. 2:16-CV-01066-TLN-KJN<br><br>**DECLARATION OF GARY GREENFIELD IN SUPPORT OF PLAINTIFF AMERICAN MULTI-CINEMA, INC.'S MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>Trial Date:   July 26, 2022<br>Time:          9:00 a.m. |

I, Gary Greenfield, declare as follows:

1. I am making this Declaration in support of the Motion for Attorneys' Fees and Costs filed by plaintiff American Multi-Cinema, Inc. ("AMC" or "plaintiff") in this action (the "Motion"). I have personal knowledge of the matters set forth herein and, if called upon to testify, I could and would competently testify thereto.

2. I have been retained by Manatt, Phelps and Phillips, LLP ("Manatt"), counsel to AMC in this action, to provide my analysis and opinions regarding the reasonableness of the attorneys' billing rates being sought in the Motion.

**Background and Experience**

3. I am the founder of Litigation Cost Management (LCM), based in Oakland, California. LCM commenced business in 1991. LCM is in the business of consulting regarding legal fee-related issues. As part of our business, we regularly conduct analyses of both legal and expert witness fees in litigation regarding the reasonableness, appropriateness and allocation of time, fees and expenses being sought, as well as hourly rates. We also consult with clients regarding how to manage their outside litigation more effectively and efficiently. LCM works with both law firms and clients of law firms in undertaking its analyses and consulting about effective litigation management.

4. Prior to starting LCM in January 1991, I was a partner in the law firm of Shartsis, Friese & Ginsburg in San Francisco, California, where I was a litigator for fifteen years, having become a partner in the firm in 1981. During my career at my former firm, I handled general commercial litigation, from pre-filing preparation and negotiations through trials and appeals. I handled litigation of varying types, including breach of contract, constitutional law, securities, fraud, bankruptcy litigation, intellectual property, unfair competition, and civil rights litigation. I represented both plaintiffs and defendants. I handled both contingency cases and cases where we were compensated on an hourly basis. I graduated from the University of California, Berkeley School of Law in 1975 and received my undergraduate degree from Stanford University in 1971. Attached hereto as Exhibit 1 is my Curriculum Vitae.

5.     Since LCM was founded, I have conducted hundreds of analyses of the legal and expert witness fees and expenses in cases of various types and sizes. These have included individual actions, multi-party suits and class actions. The cases have included the full range of civil litigation, including antitrust, breach of contract, civil rights, constitutional law, disability, discrimination, environmental, ERISA, bankruptcy, False Claims Act, insurance coverage and bad faith, inverse condemnation, patent, copyright, trademark, personal injury, products liability, Public Records Act, real property, securities, and tax cases. I have personally conducted and supervised each of these analyses.

6.     I have qualified and testified previously as an expert witness in litigation and arbitration regarding legal and expert witness fees on a number of occasions, both on behalf of parties seeking to recover their attorneys' fees and on behalf of parties opposing requests for attorneys' fees. I have provided oral testimony in arbitrations or litigation in more than twenty-five cases. I have provided written reports or testimony in the form of declarations under oath, reports under Rule 26 of the Federal Rules of Civil Procedure, and reports in arbitrations on hundreds of occasions.

7.     I was appointed a Special Master to analyze and report to the Superior Court of California for the County of San Francisco regarding the fees and expenses of various law firms and experts in an insurance company conservation proceeding before that Court.

8.     As part of my work, I also consult with law firms and clients of law firms regarding law firm billing practices, effective litigation management, and legal bill analysis and auditing procedures. I have lectured and conducted seminars for clients and law firms in each of these areas.

9.     I have taught or been a speaker at a number of programs regarding analysis of legal fees, legal bill auditing and litigation management. I also have been an instructor for the National Association of Legal Fee Analysis.

10.    For purposes of my analyses in these various cases and my consulting work, we have received, and I have analyzed, the time entries, billing rates and expenses billed in many hundreds of cases, involving law firms and law firm offices across the United States. I also

receive and review bills and rate information in cases beyond those I work on as an expert in litigation. As a result, I have reviewed the billing practices and billing rates of hundreds of firms and thousands of lawyers and non-lawyers providing services across the country. I also review databases of rates and surveys of billing rates published by legal periodicals and assembled by other legal consultants, including the Valeo Partners database, the Thomson Reuters Legal Billing Report, the Wolters Kluwer Real Rate Report, the ALM Survey of Law Firm Economics, the National Law Journal Billing Report, and others. I also regularly review cases and articles dealing with attorneys' fees, litigation management issues, and billing rates being charged in the legal industry. As a result, I am familiar with typical and commonly accepted billing practices among law firms, as well as the rates typically charged by lawyers of various experience levels and expertise both nationally and in various parts of the United States.

11. In addition, as a result of my experience, I am familiar with the common and normal processes used by courts and arbitrators in analyzing requests for fees in numerous contexts, having been involved in hundreds of requests for fees, as well as trials and arbitrations where fees were at issue.

**Testimony in Last Four Years and Compensation**

12. I have testified in deposition, arbitration proceedings or trials in the last four years in the actions set forth on Exhibit 2 hereto.

13. I am being compensated at the rate of $650 per hour for my work in this action.

**Materials Reviewed**

14. To prepare this Declaration, I reviewed the materials submitted with the Motion, including the accompanying Memorandum of Points and Authorities ("Memorandum") and the Declarations of Robert Platt (the "Platt Declaration"), Ron Herman (the "Herman Declaration"), Kevin Connor (the "Connor Declaration"), Daniel Bright (the "Bright Declaration") and the accompanying Exhibits, including all of the Manatt invoices submitted to AMC in this matter, and the Lease Agreement between AMC and the defendant Manteca Lifestyle Center, LLC ("defendant" or "Manteca") (the "Lease"). I have also reviewed the Complaint, the Findings of

Fact and Conclusions of Law and Supplement thereto, the briefing regarding the subject-matter jurisdiction issue, and other filings in the litigation.

### Analysis of the Rates Charged

15. The hourly rates being sought on the Motion, from the commencement of the case in April 2015 to date, are set forth on Exhibit 3 hereto (which is Exhibit B to the Platt Declaration). As indicated on Exhibit 3, AMC received both significant pre-billing discounts ($301,163) from the fees billed over the course of the case and a 10% discount from Manatt's normal rates. The combined rate discount and pre-billing write-offs totaled $538,180. The impact of the rate discount and pre-billing write-offs is that AMC effectively received a 20% discount from Manatt's regular rates. I will refer to the rates based on the amounts actually billed to AMC over the course of the case and therefore being sought on this Motion as the "effective rates."

16. Judicial decisions, the Rules of Professional Conduct and Court Rules have set out relevant considerations in determining the appropriate rates to be applied in cases where fees are sought in various contexts. Rule 293(c) of the Local Rules for the Eastern District of California ("Eastern District") sets out a number of the factors for consideration in assessing both the reasonableness of fees and the appropriate rates to apply in cases in the Eastern District.[1] Not all the factors will be relevant in every case, and other factors will be relevant in certain cases.

---

[1] Rule 293(c) states:

> RULE 293 (Fed. R. Civ. P. 54)
> AWARDS OF ATTORNEYS' FEES
>  ....
> (c) Criteria for Award. In fixing an award of attorneys' fees in those actions in which such an award is appropriate, the Court will consider the following criteria:
> (1) the time and labor required of the attorney(s);
> (2) the novelty and difficulty of the questions presented;
> (3) the skill required to perform the legal service properly;
> (4) the preclusion of other employment by the attorney(s) because of the acceptance of the action;
> (5) the customary fee charged in matters of the type involved;
> (6) whether the fee contracted between the attorney and the client is fixed or contingent;
> (7) any time limitations imposed by the client or the circumstances;
> (8) the amount of money, or the value of the rights involved, and the results obtained;
> (9) the experience, reputation, and ability of the attorney(s);
> (10) the "undesirability" of the action;
> (11) the nature and length of the professional relationship between the attorney and the client;
> (12) awards in similar actions; and

17. In my opinion, the factors which are relevant to determining the appropriateness of the rates to be applied in this case are:

    a. The fact that the fees have been paid by plaintiff on an on-going basis during the case;

    b. The selection of counsel by the client and the reasonableness of that decision;

    c. What was at stake or at risk in the case and the results achieved;

    d. The nature of the issues in the case, including their complexity; and

    e. The prior relationship between AMC and Manatt and the expertise, experience and reputation of the lawyers at Manatt.

**A.** **Payment of the fees during the course of the case**

18. The analysis of billing rates needs to be viewed in the appropriate context. This is not the type of fee-shifting case, such as private attorney-general or contingency cases, in which the clients do not pay the fees during the case. In many of those cases, the lawyers do not have regular rates which they use for billing their clients; and the client has no interest, and is playing no role, in managing the cost of the case. The courts are therefore presented with the task of identifying the reasonable and appropriate rates for the lawyers involved for any fee award. The approach that has been developed for those cases is to attempt to determine and then apply the rates that are paid to comparable lawyers in the market who perform work that is comparable to the work required in the case. However, as stated, this is not one of those types of cases (although I will address that test below).

19. In this case, AMC, a sophisticated client with experienced in-house counsel, has been paying the fees and expenses during the case on an on-going basis, with no certainty of reimbursement of those fees and expenses.[2] AMC therefore had every incentive to manage the case as cost-effectively as possible, including regarding the rates charged. In addition, as set forth in the Connor Declaration, Kevin Connor, Senior Vice-President, General Counsel and Secretary

---

    (13) such other matters as the Court may deem appropriate under the circumstances.

[2] While there is an attorneys' fees provision in the Lease, pursuant to which the prevailing party in litigation would be entitled to recover its attorneys' fees and costs, there is obviously no certainty as to who will be the prevailing party in a particular case.

at AMC, who was managing the case, understood and took into account the relevant factors in Rule 293(c) discussed below--what was at stake in the case, the complexity and the breadth of the issues in the case, Manatt's experience and expertise, and the long and successful relationship between AMC and Manatt in theater lease litigation. See Connor Declaration, paras. 5 through 9. Taking those factors into consideration, Mr. Connor selected Manatt to represent AMC. *Id.* [3]

### B. The amount at stake or at risk in the litigation and the results achieved

20.   What is at stake or at risk in litigation obviously impacts whom one hires as counsel for the case. In this case, AMC not only successfully recovered $1.9 million in overcharges (which included interest), but defendant was insisting, over AMC's objection, that AMC pay an additional approximately $9.2 million in property taxes and CFD assessments over the remaining term of the lease (including four five-year options). Thus, AMC had over $11 million at risk. That amount plainly justifies AMC's hiring experienced counsel with significant expertise in litigating theater leases and the related tax issues to litigate the case and to pay the necessary rates.

21.   Further, the result achieved--recovering what was paid under protest after the filing of the Complaint, plus interest, and eliminating the need to pay over $9 million more over the remaining term of the Lease--plainly demonstrates the wisdom and appropriateness of retaining Manatt to handle the case. [4]

### C. The nature of the issues in the case, including their complexity

22.   This was a complex case that involved the application of the Mello Roos Communities Facilities Act of 1982 ("Mello Roos Act") and regulations thereunder to the Lease, as well as the interpretation of the Lease. AMC is the major tenant in a shopping center owned by the defendant. The major issue was how to determine AMC's proportionate share of the Property Taxes (as defined under the Lease) including the Community Facilities District

---

[3] Mr. Connor has been AMC's General Counsel for twenty-three years and is very experienced in managing litigation. Connor Declaration, paras. 2 through 4.

[4] The only issue which AMC lost at trial was its claim that it should be entitled to recovery of the payments it made prior to the filing of the Complaint because those payments were made "under protest." The Court ruled, however, that those payments could not be recovered under the "voluntary payment" doctrine.

Assessments ("CFD Assessments"). This required not only an understanding of the Mello Roos Act, but application of its provisions to the Lease.

23. One of the major disputes in the case stemmed from the fact that the defendant argued that a Letter of Intent ("LOI") between defendant and Kerasotes Showplace Theatres, LLC (from whom AMC had acquired the Lease) should be used to interpret the Lease to allow defendant to calculate AMC's proportional share of the Property Taxes under the Lease. Defendant interpreted the LOI to increase AMC's portion of the Property Taxes from 17% to two-thirds of the Property Taxes. To defeat defendant's contention required an analysis of whether the parol evidence rule barred the introduction of such extrinsic evidence to interpret the Lease, and, if the evidence were allowed, what the proper interpretation of the Lease would be. This in turn required examining public documents and reviewing other tenants' leases, as well as analyzing AMC's own documents, to see what AMC was paying relative to the other tenants in the shopping center. This also required a detailed financial analysis of the property tax bills related to all the parcels at the shopping center. Ultimately, the Court ruled that the Lease was not ambiguous and that defendant's proffered parol evidence was accordingly not admissible. The Court also concluded, however, that, even if the parol evidence were admitted, the LOI in fact supported AMC's interpretation of the amount of Property Taxes AMC owed and would owe under the Lease.[5]

24. There were other issues as well, including whether the Court had subject-matter jurisdiction over the dispute, an issue that was raised by the defendant and upon which the Court ordered briefing. The Court ultimately concluded it had subject-matter jurisdiction.

25. In short, the dispute contained a number of complex legal and factual issues related to the proper application of both the Mello Roos Act and interpretation of the Lease.

---

[5] The potential impact of the LOI, assuming that admitting it did not violate the parol evidence rule, provides an example of the complexity of the case. It is my understanding that ultimately Manatt effectively "reverse engineered" the calculations made in the LOI and was able to demonstrate that the $5 per square foot estimate in the LOI of the Property Taxes was likely based on the assumptions that the shopping center would be entirely leased out (which did not occur) and that $25 million in bonds would be issued (when ultimately only $6.245 million in bonds were issued). The analysis which Manatt had to undertake, see Platt Declaration, paras. 48-49, resulted in the determination that the LOI actually supported AMC's position as to what its proportionate share of the Property Taxes should be, rather than the defendant's position. This was clearly a complicated issue.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

7                    DECLARATION OF GARY GREENFIELD

**D. The prior relationship between AMC and Manatt and the expertise, experience and reputation of counsel**

26. Mr. Platt is a 1982 law school graduate, Platt Declaration, para. 2, and has represented AMC for over thirty-eight years. *Id.*, para. 4. As described in the Connor and Platt Declarations, AMC and Manatt have had a very long relationship during which the firm has successfully represented plaintiff in a number of cases involving issues related to theater leases and other matters, and, as a result, AMC places a great deal of trust and confidence in Mr. Platt and Manatt. Connor Declaration, paras. 5 through 9; Platt Declaration, paras. 4 through 5.

27. Various Manatt lawyers who have worked on AMC's matters have different areas of expertise related to theater leases, ranging from handling litigation to advising on tax issues. Because of the long relationship between AMC and Manatt, Manatt has become intimately familiar with plaintiff's business. As a result, Manatt not only does not have to "get up to speed" about AMC's business to handle its work, but it has developed the experience and expertise to handle AMC's legal matters efficiently. [6]

28. Further, Manatt as a firm has an excellent reputation for trying complex litigation matters and is very experienced in handling this type of case. The two main senior lawyers on the case have been Mr. Platt, who has an outstanding reputation as a lawyer for handling complex litigation, including theater lease cases, and Mr. Steere, who is an expert in transactional real estate and tax matters and a 1980 law school graduate. Platt Declaration, paras. 11 and 12; Connor Declaration, para. 9. Their backgrounds, experience and expertise, as is true of the rest of the main Manatt lawyers on the case, are comparable to those of lawyers in other firms of comparable size and with comparable resources, handling complex litigation in the Eastern District as well as across the country, as discussed below. Platt Declaration, paras. 13 through 15.

29. Moreover, for the first approximately seven years of the case, from the filing of the Complaint in May 2016 until February 2022, when trial preparation had to be commenced for the

---

[6] Mr. Platt in particular has handled a large number of different legal matters for AMC and successfully litigated and tried a number of theater lease cases and other cases for AMC across the country. Platt Declaration, paras. 4 through 5.

then-scheduled June 2022 trial, Mr. Platt, whose rate is the highest among the Manatt billers, did a relatively small amount of work on the case (averaging about one hour per month—a total of just over 85 hours) in an effort to keep the fees (and the effective billing rate) as low as feasible by minimizing his involvement in the case. Platt Declaration, para. 9. The overall effective billing rate for the firm would have been significantly lower had the case settled before the trial preparation commenced.

30. In short, AMC is a sophisticated consumer of legal services and plainly could have selected counsel with lower rates if it felt that was cost-effective, but it chose Manatt. Given what was at stake in the case, its complexity, the results achieved, the experience and expertise of counsel, and the prior relationship between plaintiff and counsel, the decision to retain Manatt and pay the rates sought was plainly a reasonable one, which itself demonstrates that the rates paid were reasonable.

### Rates for Comparable Lawyers Doing Comparable Work

31. A test commonly articulated in judicial decisions for determining the reasonableness of rates in various types of fee-shifting cases is to determine the rates of comparable lawyers doing comparable work in the market, which is initially defined as the geographic area of the forum (in this case, the Eastern District). If one applies that test here, the rates sought are reasonable.

32. First, under this test as applied by the courts, one does not look simply to the rates in the forum of the litigation where there is a good reason to retain counsel outside the forum. In this case, neither party retained lawyers who worked primarily in the Eastern District.[7] Defendant retained Wong Fleming, which, like Manatt, specializes in entertainment law, commercial litigation, real estate and tax, among other areas. See https://www.wongfleming.com/practice-areas/. The firm is headquartered in New Jersey with offices across the country and has a

---

[7] Manatt has a Sacramento office, but the lawyers there, being primarily government relations specialists, were not involved in this action. In any event, Manatt charges the same rates for the lawyers in its Sacramento office as it charges in its other offices.

California office in San Diego. The lawyers who actually did the work on the case are based in New Jersey.[8]

33. Thus, like AMC, defendant found it prudent to retain lawyers outside the Eastern District because of the need for specialized counsel. For that reason, it would be inappropriate to look solely at the forum rates to determine the appropriate rates to apply.

34. Nevertheless, the Manatt rates are in fact in the range of rates for comparable lawyers doing comparable work in the Eastern District. Manatt is a prominent national law firm with offices across the country, comparable to firms in the AmLaw 200 in terms of size and breadth of practice. These are the types of firms that clients would typically retain for complex commercial cases where the amount at issue is similar to the amount at issue in this case. I am familiar with the rates of the firms in the AmLaw 200 through my work, and Manatt's standard rates are comparable to the rates of those firms both in the Eastern District and generally. As noted earlier, in this case, AMC was effectively billed rates which were 20% lower than Manatt's standard rates.

35. In order to confirm my opinion, we analyzed rate data gathered by the Thomson Reuters—Peer Monitor online metrics tool ("Peer Monitor"), which gathers and uses rate data from Thomson Reuters law firm clients, based on the rates charged by those firms.[9] We compared the rates of the law firms in the AmLaw 200 in the Sacramento area, *i.e.,* comparable to Manatt in terms of size and general nature of their practices, for the period 2015 through 2023. We looked at the average rates of the lawyers in the Peer Monitor data at the same levels as the Manatt lawyers involved in the litigation and calculated the variance between the effective rates of the Manatt lawyers versus the rates of the other firms in the Peer Monitor data. The comparison is set forth on Exhibit 4 hereto (which is also Exhibit D to the Platt Declaration**).** The Manatt rates, over the eight-year course of this litigation, ranged from 18% lower to 22% higher than the rates of the

---

[8] Moreover, AMC was not aware of any law firm in Sacramento or elsewhere in the Eastern District that combined the trial experience of Mr. Platt (along with his knowledge of AMC's business) and the experience of Mr. Steere with the Mello Roos Act. Connor Declaration, para. 9.

[9] Thomson Reuters gathers rate data from its law firm clients which include over half of the clients in the AmLaw 200 (the 200 largest law firms in the country). The rate data is then made available to Thomson Reuters' clients.

billers at comparable levels in the other Sacramento firms,[10] depending on the level and the year, with most of the variance being within 10%. Thus, as the data shows, the hourly rates of the lawyers on the Manatt team who worked on and tried this case are in the same range as the rates of the lawyers in comparable firms in the Sacramento area.

36. It should be noted that the comparison made was with the *average* rates in the Peer Monitor data versus the *average* rates in the Manatt equivalent categories. Both Mr. Platt and Mr. Steere are at the upper levels of seniority in their categories (Mr. Platt has been in practice for 41 years and Mr. Steere for 43 years), and it would be expected and reasonable that a client would pay more than the average rate for lawyers of their experience and expertise, which further demonstrates the reasonableness of their rates and the Manatt rates overall.

37. In summary, while AMC was fully justified in using lawyers from outside the Eastern District (as defendant did), the rates charged in this case are in the range of rates charged in the Eastern District in complex, high stakes litigation by lawyers comparable to the lawyers in this case.

**Non-Lawyers**

38. I am also familiar with the range of rates charged for the work of paralegals and other non-lawyers in complex litigation. As is true for the lawyers, the rates being sought here are comparable to the rates of other non-lawyers performing similar types of services.

---

[10] The 22% positive variance was effectively based on one associate in 2016. Other than that instance, the highest positive variance was 13% for Mr. Platt in 2023, and one would expect the reasonable rate for Mr. Platt to be at the top of the range.

## SUMMARY

39. The rates here were being paid by a sophisticated client that had no certainty of being reimbursed. AMC chose counsel based on Manatt's experience and the needs of the case. In addition, the decision by AMC to retain Manatt was reasonable and the rates charged were reasonable given what was at stake for AMC, the complexity of the case, the experience, expertise and reputation of counsel, and the long-standing and successful relationship between AMC and Manatt. Further, just as defendant chose "out of forum" counsel, it was reasonable for AMC to do the same. Moreover, the rates that have been charged are in fact within the range of rates for comparable lawyers undertaking comparable work in the Eastern District.

40. Accordingly, in my opinion, the rates billed in the litigation and sought on this Motion are reasonable.

[SIGNATURE ON FOLLOWING PAGE]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this Declaration on August 2, 2023, in Oakland, California.

_____
Gary Greenfield

Litigation Cost Management | **List of Exhibits** | AMC

| | |
|---|---|
| 1 | Curriculum Vitae of Gary Greenfield |
| 2 | Trial, Arbitration and Deposition Testimony (Last Four Years) |
| 3 | Manatt Billing Information |
| 4 | Peer Monitor Data and Comparison |